GeeeN, Judge,
delivered the opinion of the court:
It appears without dispute that plaintiff entered into a contract to construct for the defendant a building at West Point, New York. The plaintiff undertook the work, and with the aid of the surety on its bond completed it, but the delays which were incurred in its completion resulted in a greatly enhanced cost of labor and materials over and above what he had anticipated, and he and the bonding company incurred a large loss. Claiming that the defendant was responsible for these delays and the increased cost, this suit *124 has been brought by plaintiff in part for the use of the surety on its bond, to recover the damages alleged to have been sustained.
The plaintiff alleges in the petition that the defendant agreed to have the site for the building cleared by July 1, 1919. The evidence leaves no doubt that defendant failed so to do. In fact, the site was not completely cleared until some eight or ten months later. There is likewise no question but that the delay in clearing the site was the principal cause of the delay in the work upon the building.
The case turns largely on the question of whether the evidence shows that the defendant agreed to have the site for the building cleared by July 1, 1919. On this point the evidence is somewhat conflicting and we think it best to call attention to its most salient features.
Herbert 8. Keffer, estimator for McCloskey, visited West Point and examined the site about a week prior to the submission of the proposal. He was accompanied by David Hoskins. They met the Government superintendent, God-ing, the official in charge of the work. Keffer testifies in substance that he asked Goding how long it would tako to get the excavation completed, and told him that it would make quite a difference in the bid, and says that he explained to Goding that the work would be a lot cheaper if started early in the summer than if it was held over another year. The witness also says that Goding said it looked as if this was quite reasonable and it (the clearing of the site) would be done by July 1, 1919.
After this meeting took place the plaintiff submitted its bid, and when the bids were opened there seems to have been some difficulty about their acceptance on account of the estimate being beyond the requirement. The plaintiff, M. H. McCloskey, jr., saw Mr. Goding and, together with him, went to examine the site, but on account of snow on the ground the plaintiff was not able to determine the extent of the excavation. The plaintiff testifies that he asked Goding “ when they were going to be out of there,” meaning we conclude, when the excavation upon the site was to be finished. McCloskey says that Goding answered, “ You *125 can figure on getting on there on July first,” and that he (McCloskey) said, “ There isn’t any question about that, is there, and he [Goding] assured me there was none.” If this testimony is to be accepted, it follows that the contract subsequently executed was made in reliance upon the agreement to clear the site by July first.
Shortly afterwards the contract was executed; McCloskey returned to West Point about the fifth or sixth of May, and had a conversation with Goding and Col. Timberlake, who, it seems, had succeeded Goding as the Government superintendent of the work and who executed the contract on behalf of the defendant; and plaintiff testifies that he again asked Timberlake whether he would be ready by July first “ so that we can start this job without any interruption,” and that Timberlake said, “ positively.”
Four other witnesses testify to conversations after the execution of the contract with Goding and Timberlake, in which the representatives of the Government gave assurances that the site would be cleared by July first. It is not probable that these statements would have been made if the contract with reference to the clearance of the site had not been made as alleged by the plaintiff. This testimony,, therefore, tends to corroborate the testimony of Keffer and McCloskey.
There is other evidence ‘ that tends to corroborate the plaintiff on this point. The construction contract required the contractor to furnish “ a schedule of progress of construction giving dates of completion of various classes of work.” If, as claimed by the defendant, there was no understanding as to when the site should be cleared, it is obvious that no schedule of progress could be furnished, but the evidence shows that such a schedule was requested before the work was begun.
In our opinion the testimony of the witnesses1 for the defendant is not sufficient to overcome this evidence; in fact, Goding makes only a qualified denial of the testimony of Keffer and McCloskey, and what he does say is only after repeated questions by counsel for the defendant. His testimony is not consistent with the testimony given on behalf *126 of the plaintiff, but we think the latter is, under all the circumstances, much more worthy of credit.
It is hardly conceivable that an experienced contractor like the plaintiff would enter into a contract of this nature without having a definite understanding as to when he could begin the work. It is quite obvious, as Keffer stated in his testimony, that the work could be done cheaper in the summer than it could be done in the winter. Moreover, there were all Irinds of contingencies that might affect the contractor in his performance of the work if it was indefinitely postponed.. All of these matters are set out in the findings of fact which are supported by the preponderance of the evidence. There is much conflict in the evidence also as to the facts stated in Finding IX, which is in effect that the site could and should have been completely cleared and ready by July 1st, 1919. The evidence on this point is quite voluminous, but the preponderance is clearly in favor of the plaintiff.
Six witnesses gave testimony which, if correct, could only justify the conclusion that the site could, with the exercise of reasonable diligence and modern methods, have been cleared in from thirty to sixty days from the date of the execution of the contract; and the testimony of Timberlake, instead of rebutting this testimony, tends to confirm it when taken in connection with the evidence as to the amount of work done from March 31 to May 1, 1919. The witnesses who testified on behalf of plaintiff were all experienced in blasting work, and several of them had done a large amount of work in cities, where the difficulties to be encountered were at least as great as at the site in question. So far as one inexperienced in such work can acquire knowledge from photographs, the photographs taken of the progress of the work tend to sustain the contentions of the plaintiff. We see no good reason why the site could not have been cleared by July 1, 1919, if experienced parties with sufficient help had taken charge of the work.-
Counsel for defendant call attention to delays on the part of the plaintiff in furnishing some of the structural iron work, artificial stone, and other materials, but it was useless *127 for the plaintiff to arrange to have the material on the ground before it could be used; in fact, to do so would simply have further encumbered the work. To state the situation briefly, one delay was the cause of another, and so on all through the work. Subcontractors abandoned their contracts, freight embargoes were encountered, and material became difficult to obtain. The original delay in failing to have the site ready was the primary cause of all.
It is urged on behalf of defendant that parol evidence to establish a contract or understanding with reference to time when the site was to be cleared is inadmissible. The general rule is that the terms of a written contract can not be varied by prior negotiations and understandings which are considered to have been merged in the written instrument. But this rifle, like many others, has some exceptions'. In 22 Corpus Juris, p. 1253, sec. 1665, it is said:
“ The rule admitting parol evidence of a collateral agreement is especially applicable where such agreement constituted a part of the consideration of the written agreement, or operated as an inducement for entering into it, * *
This rule seems to us particularly applicable in the case at bar. Strictly speaking, the parol agreement upon which plaintiff bases its case was a distinct agreement from the written contract, although collateral thereto. It does not vary any of the terms of the written agreement, although in one sense it may be said to enlarge them. The written contract provided that the work was to “ commence ” when the site was completely cleared and completed within ten months after the work was begun. If the contract was plain and unambiguous as to the time when the site was to be cleared or the time when the work was to be begun, parol evidence could not be received to contradict it, but such is not the case, and we believe parol evidence to be competent to show the inducement to the contract, for certainly the statements made to McCloskey were an inducement to the contract. It may be difficult to find a decision in the reported cases setting forth conditions that exactly coincide with those in the case at bar, but numerous cases can easily be found that support the principle invoked. So, also, when the parol evi *128 dence does not conflict with the terms of the contract, it is held by numerous authorities that it may be received to show the intention of the parties. In this case, if the testimony on behalf of plaintiff is to be credited, as we have found it should, the intention of the parties can only be made clear by extrinsic evidence. In this way alone can a just interpretation be given to the contract.
It should be said further that in any event the defendant was bound to have the site cleared within a reasonable time. It failed to do this and for its failure must be held responsible. We are of the opinion that the early part of July, 1919, was a reasonable time.
There were other delays to the damage of plaintiff which were caused by defendant in that it failed to comply with the provisions of the contract and specifications with reference to the manner in which the excavations should be made and the foundations prepared. These delays also added to the expense in both work and material and what was more serious, caused still other delays. It is obvious that the defendant is liable for the damage thereby incurred.
It is insisted that the plaintiff could not go on with the contract when it found that defendant would not prepare the site within the time agreed upon and thereafter bring suit for damages, but we know of no such rule. It may be that plaintiff could have elected to cancel or abandon the contract, but it also had the right to perform its part of the contract and claim damages for the defendant’s failure on its part, provided, of course, there was no acquiescence in this failure on the part of the plaintiff, and the evidence shows abundantly that this did not occur.
Crook Co. v. United States, 59 C. Cls. 593, is cited as supporting the contention of the defendant on this point. Some of the language in the opinion, as quoted in the brief of counsel for defendant, standing by itself, might justify such an inference, but when the case was appealed to the Supreme Court (270 U. S. 4) neither this language nor anything with the same meaning is repeated in the opinion. The case was affirmed, but it was on the ground of peculiar provisions in the contract. This court and the Supreme Court have *129 repeatedly held that a contractor may recover the damages he has incurred by reason of delay wrongfully caused by the Government. See Crook Co. v. United States, 59 C. Cls. 348; Goldstone v. United States, 61 C. Cls. 401, and cases cited.
The evidence on the whole may be summed up by saying that* the agents acting for the Government paid no attention to the verbal contract to have the site cleared on July 1, 1919, and were careless as to the performance of the provisions of the written contract with reference to how the site should be cleared.
Having found that the defendant was responsible for the delay in clearing the site and the failure to clear in the manner required by the contract, it becomes necessary to determine the amount that plaintiff was damaged thereby.
The evidence is extremely voluminous, and it is impossible to set out the details as to each item of damage within the reasonable length of an opinion. The testimony has been gone over with great care with respect to every detail thereof, both by the commissioner who heard it and by the court upon the original record. The evidence shows that if the site had been properly cleared at the time agreed upon, the contract could have been completed within the estimates placed on the several branches thereof by the plaintiff at the time the bid was made. This was proved in many cases by the actual offers of subcontractors who in some instances made a bid of an amount less than that fixed by plaintiff in the estimates. The damage or loss to the plaintiff was what he was compelled to pay over and above the cost and expense which would have been incurred had he been able to commence and proceed with the work in regular order upon a site prepared in the manner specified in the contract, and ready at the date agreed upon. The total amount to be recovered by plaintiff will include not only the extra amount paid for work and material, but also the amount deducted from the contract price by defendant in making payment on account of damages for delay; the amount of the judgment obtained against plaintiff by the Special Service Flooring Corporation for delay caused by *130 reason of the failure to furnish heat which the defendant had agreed to supply; the additional premium on the bond; additional payment for liability insurance; the additional amount paid for overhead and superintendents; and the cost of the overseer furnished by the bonding company, which by its contract with that corhpany the plantiff was obliged to pay; but the plaintiff will not be allowed anything, for profit which it might have made as that sum was included in the contract price which, under the judgment to be rendered herein, it will receive together with the damages caused by delay. The amended petition asks judgment for $330,-604.05. We find that the plaintiff is entitled to recover $230,829.18,, of which $140,000 is for the use of the surety company.
In accordance with the foregoing opinion the motion of the plaintiff for a new trial is sustained, the findings of fact heretofore made are set aside, and the opinion rendered thereon withdrawn. An order to that effect will be entered, and judgment rendered in accordance with this opinion.
Moss, Judge; and Booth, Chief Justice, concur.
Graham, Judge, took no part in the decision of this case.