Booth, Chief Justice,
delivered the opinion:
The plaintiff is a New Jersey corporation. On December 26,1918, it entered into a written contract, identified as No. 3604, with the Navy Department through the Bureau of Yards and Docks to furnish, deliver, erect, and paint all the structural steel specified therein, essential to the construction of a furnace building, a machine shop, an open-hearth building, and a heat-treatment building at the Naval Ordnance plant, South Charleston, West Virginia. Plaintiff was to receive $0,054 for each pound of steel in place in the four buildings. The contract was to be completed in 240 calendar days from the date of its delivery to the plaintiff. The contract was delivered to the plaintiff on January 27, 1919, and hence was to be completed by September 24, 1919. The Government officials in charge were by the terms of the contract obligated to construct the foundations upon which the steel was to be superimposed, and after the contract was executed the Government officials expressly agreed to complete the foundations upon the following dates: the open hearth and machine shop foundations by May 1, 1919; the forge and furnace building by June 15, 1919, and the foundation for the heat-treatment building by June 1, 1919. The plaintiff proceeded to perform the contract until March, 1920, at which time all four buildings were about ninety per cent completed, it being conceded that plaintiff had then proceeded as far as *357 it was possible to proceed because substantial portions of the foundations had not been constructed by the defendant. The plaintiff then, with the consent of the defendant, removed its force of workmen from the site of the work and requested the defendant to engage someone else to complete the work. Subsequently, the date not being shown, the defendant requested the plaintiff to return its organization to the site and complete the work. The plaintiff in response requested the defendant to increase the consideration for performance of the contract because of the increased cost due to the defendant’s delays and failure to provide the essential foundations. The defendant thereupon appointed a board of changes under the general provisions of contract No. 3604. As a result of the recommendations of this board an agreement known as supplemental contract No. 3604Y, dated September 15, 1920, was entered into by the parties. Contract No. 3604Y recited that because of the failure of the defendant to furnish the necessary foundations and thereby permit the plaintiff to effectively prosecute the work as provided in contract No. 3604, and because of the increase in cost of performance due to this delay, the parties agreed that contract No. 3604 would be and was modified to the extent stipulated in No. 3604Y. The material factor with which this case is concerned, as to this item, is centered in the change of consideration for completing the contract. Contract No. 3604 provided for $0,054 per pound. Contract No. 3604Y added to this $11 per ton in place.
The plaintiff thereafter reorganized its company, proceeded to the site of the buildings, and engaged in doing so much of the work as it was possible for it to do. On December 22, 1920, the plaintiff completed all the work and was willing and ready to proceed to completion, but was prevented from going forward by the failure of the defendant to furnish foundations, so for the second time it was, with the consent of the defendant, compelled to remove its workmen and equipment from the site and was not thereafter able to resume work until June 8, 1921. On January 20, 1922, the plaintiff was for the third time, for the same reasons stated above, compelled to withdraw its work *358 men and equipment from the site with the defendant’s consent, receiving on February 10, 1922, a notice from the defendant to permanently discontinue work.
On February 27,1920, a contract, identified as No. 3604X, was executed by the parties. This contract called for the furnishing of 400 tons of structural steel for a substation building, a building in addition to those mentioned in No. 3604 at the Naval Ordnance plant, South Charleston, West Virginia.
It is conceded, and the facts indisputably establish, that the plaintiff was willing, ready, and capable of observing its obligations under the contracts involved, and that its failure to complete the work in accord therewith was solely attributable to defendant’s failure to furnish the essential foundations. The record shows that because of the failure of the defendant to furnish foundations for the furnace and heat-treatment buildings they were not completed until June 14, 1920, and January 20, 1922, respectively.
The Bureau of Yards and Docks conceded that there was due the plaintiff under the terms of the foregoing contracts a balance of $19,340.24 and prepared and submitted to it a voucher for this sum. The Comptroller General on or about November 27, 1926 (Finding XIII), ruled in a written opinion that the sum of $28,149, being the sum stated to be due the plaintiff under the increased prices stipulated in supplemental contract No. 3604Y, was illegally paid to it, and in pursuance of such ruling checked against and recouped said sum by applying the voucher for $19,-340.24 and other sums due the contractor in settlement thereof. This suit is for the recovery of the said sum of $28,149 and for other items of loss to be discussed hereafter.
If we correctly apprehend the determinative principle in the opinion of the Comptroller General, it is the rule that where one engages to do a certain thing at a stated price, an increase in price by way of a supplemental contract to do that precise thing is without consideration and hence not allowable. It is true, as said in the opinion, that the contract provided for delays, extension of time, liquidated damages, changes, unavoidable delays, and the usual provisions *359 of Government contracts, but it does not impress us that any of these provisions are applicable to the existing record. The defendant, so far as the present record discloses, did not change the specifications for the foundations for the buildings. The dereliction complained of is that the defendant did not act except in a most dilatory manner and frequently not at all. The contract obviously covered delays due to activities with respect to construction and not inaction, in no way ascribable to such a cause. The defendant failed to proceed as it agreed and offers no excuse for the failure. When action was taken, the board of changes, viewing the situation from the standpoint of facts, recommended the increased compensation and the defendant accepted the recommendation, acting thereon by executing with the plaintiff supplemental contract No. 3604Y. The defendant had agreed to furnish the foundations upon specific dates and had not done so. The plaintiff could not proceed until they were furnished, and nothing remained for it to do except withdraw its force of employees from the work and escape the expense incident to their maintenance. It is not suggested in the record that the defendant’s delay was due to any change in the specifications for the foundations; the changes contemplated embraced other features of construction that, in so far as the findings show, bear no relation to the foundations upon which the buildings were to rest. This case apparently falls within the recent case of Worthington Pump & Machinery Corp. v. United States, 66 C. Cls. 230: a case in all substantial respects precisely similar to this one. The present case is essentially different from the Eric Lange case, 61 C. Cls. 666. In the Lange case the plaintiff did not withdraw from the work and return thereto only under a new agreement for increased cost of performance. The Bureau of Yards and Docks in the Lange case did not act upon the recommendation of the board of changes and enter into a supplemental contract, or issue a change order as was done in the instant case. In this case it is manifest from the findings that the plaintiff without fault was permitted without protest to abandon the work under its contract, withdraw its workmen and equip *360 ment from the site, and did not return thereto until the new or supplemental contract was executed. We think what the-plaintiff agreed to do in the supplemental contract was of value to the defendant. The plaintiff had vigorously and expeditiously performed its obligations under its contract.. It was familiar with the work and competent to do it. It had fabricated much of the material and was in a much better position to perform the remaining work under its-contract than a stranger to the transaction could have done- and at a lower price. The defendant recognized this situation, for under the contract a provision obtained to annul it if the contractor failed to perform, and this was not done,, nor even contemplated by the defendant. This case in some-respects is similar to the case of Bliss Co. v. United States, 275 U. S. 509. True, in the Bliss case the contractor was required to incur additional expense, but the case establishes, a rule that a supplemental contract may reflect consideration for its execution notwithstanding it is designated as supplemental. We think the plaintiff’s cause of action is for a-breach of contract as held in the Worthington Pump case.. The court in its opinion said (p. 240) :
“ We think also there was a breach of the original contract on the part of the Government. True, the Government did not expressly agree to have the pump well ready by any fixed time, but the contract provided that the plaintiff sliould install the pumps at a fixed date, and it could' not do so unless the pump well was ready some time in advance of the date so fixed. There was an implied contract-on the part of the Government that the well would be ready,., and the agreement of the plaintiff to go on and complete the contract at a future date at an increased cost for labor and other matters furnished a consideration for the supplemental agreement in the way of detriment to plaintiff and benefit to-defendant.
“ The supplemental contract recited that the time of installing the pumping plant under the original agreement had' been changed and that the time for the completion of the-work * * * is hereby extended to June 15, 1921.’ Obviously, this was a change in the original contract as to specifications. The case of H. E. Crook Co., 270 U. S. 4, is cited' on behalf of defendant, but there are several important differences between the facts in that case and those in the case- *361 at bar which are noted in the opinion of the Supreme Court. There was the same kind of a provision with reference to delays on the part of the Government being regarded as unavoidable, but the court says this was £ probably inserted primarily for the contractor’s benefit as a ground for extension of time,’ although it also says that this provision ‘is not without a bearing on what the contract bound the Government to do.’ But in particular and as decisive of the case the Supreme Court says: ‘ The plaintiff agreed to accept in full satisfaction for all work done under the contract the contract price, reduced by damages deducted for his delays and increased or reduced by the price of changes, as fixed by the Chief of the Bureau of Yards and Docks.’ The provision of the contract is the same as in the instant case, but in the Crook case the Chief of the Bureau of Yards and Docks did not increase the contract price on account of' changes; in the case at bar it appears without conflict that, he did fix the increase after a board had been appointed to examine and ascertain the proper amount and signed an agreement to pay the sum so fixed.”
In this connection compare McCloskey case, 66 C. Cls. 105.
REHANDLING STEEL
Finding XVIII, to which the defendant interposes no objection, states the facts in detail. The plaintiff under a defined time limit for the completion of its work planned to unload the structural steel for the same adjacent to the points where it was to be put in place. This was to be accomplished by erection tracks through the buildings. The failure of the defendant to furnish and complete the essential foundations compelled the plaintiff to duplicate its loading and unloading processes at considerable expense. The steel had to be unloaded outside the buildings and then during the months of August, 1919, to February, 1920, when the foundations were completed, plaintiff had to reload and unload the same again in moving it to the points of installation. This condition obtained as to a large portion of the steel for the forge and furnace building and for platforms in the open-hearth building. It is conceded that the extra expense involved amounted to $6,895.93. The board of changes, in its report June 30, 1922, considered this item and recommended its allowance. The Chief of the Bureau of Yards. *362 and Docks declined to allow it on the ground that it was an unliquidated damage claim, and hence not within the jurisdiction of the bureau. The Comptroller General rejected it on the ground that the defendant was' not liable for losses or damages sustained by the contractor in performing the contract due to delays in completing the foundations. We think the item is allowable under the decision of the Supreme, Court in the case of United States v. Wyckoff, 271 U. S. 263. In this case the contractor was obligated to lay creosoted wood block floors in the Navy Buildings at Norfolk, Virginia. This particular work was to be commenced and completed within certain specific dates. The Government delayed the contractor to the extent of precluding the completion of the work for more than two years through its neglect to furnish concrete bases. The Supreme Court said:
“ The Government’s delays confessedly caused the contractor some loss. For the loss so suffered the Government was confessedly liable,” and proceeds to fix the measure of damages at the proven extent of actual loss. As to this ,-item we have a similar situation. The plaintiff, put to the necessity of expeditious and naturally economical handling of large quantities of structural steel, is denied the right to adopt a process recognized as efficient for the purpose, and through the absolute failure of the defendant to observe its contractual obligations incurs the expense of rehan-dling the same. This, we think, was a distinct loss suffered by the plaintiff, to which it is entitled to judgment. It is suggested that this added cost of rehandling was intended to be covered by the increased cost of performance stipulated in supplemental contract No. 3604Y. The added expense incurred under this item antedated contract No. 3604Y. The facts concerning it occurred prior to March, 1920, when the plaintiff abandoned the work, viz, in the months of August, 1919, to February, 1920. Contract No. 3604Y contemplated future performance. It was an inducement .offered the plaintiff to return and complete the unfinished work and we do not think it covered this loss. The amount agreed upon is $6,895.93.
*363 RENEWING PREMIUMS ON BOND
Finding XIX. Paragraph 56 of the specifications, made a part of contract No. 36.04, required the plaintiff tó, and it did give a bond for the faithful performance of the contract.. Under the provisions of contract No. 3604 the work was to be completed by September 24,1919. Confessedly due to the defendant’s failure to observe the contract, the plaintiff’s work was not completed until long thereafter. Under the provisions of contract No. 3604Y the plaintiff was to and did furnish an additional bond. Contract No. 3604Y extended the date of completion to. October 15, 1920, and it is not denied that the plaintiff was willing, ready, and could have completed the work within the time specified. The work, because of the Government’s default, was not completed until much later, and the bond exacted of .the plaintiff was not released to the bonding company until March 8,1922. From October 15, 1920, to March .8, 1922, the plaintiff was compelled to pay a premium on the same, $5,246.59, a sum it would not have been compelled to pay if the contracts had been observed upon the part of the defendant. This, it seems to us, was a clear out-of-pocket loss. This item of claim was likewise before the board of changes. The board recommended an allowance of $8,051.47 under the mistaken belief as to the amount of and the dates when the added expense was incurred. The Chief of the Bureau of Yards and Docks and the Comptroller General disallowed the item for the same reason stated as to the previous item. We think it allowable, and the amount of $5,246.59 will be included in the judgment.
COST OE STORING TOOLS AND EQUIPMENT
In January, 1922, the plaintiff had completed all the work it could possibly do, and for lack of foundations to be furnished by the defendant the work was suspended with an agreement between the parties that the plaintiff would return to the site of the work and resume operations on May 1, 1922. However, on February 10, 1922, the defendant directed the plaintiff to permanently suspend work and remove *364 its equipment from the site. The plaintiff when work was suspended in January, 1922, stored its tools and equipment for safekeeping and preservation in anticipation of resuming work on May 1, 1922. It is agreed that labor cost of so ' doing was $401.91. The board of changes recommended the allowance of the item. The Chief of the Bureau of Yards and Docks and the Comptroller General rejected it for the same reasons previously stated. We think the item is allowable. It is true that paragraph 26 of the specifications and paragraph 6 of the general provisions impose upon the contractor the expense of storing and caring for its tools and equipment, but these provisions refer to work in progress. As to this item the plaintiff incurred the additional labor expense of storing its tools in anticipation of returning to the work and completing its contract. The defendant prevented its return, and had the plaintiff been informed when the work was suspended that it was not to return to the job it could have removed the tools and escaped this expense. The item is a small one, but impresses us as a loss directly traceable to defendant’s default. The amount, $401.91, will be included in the judgment.
TRAVELING EXPENSES OF FOREMAN, TIMEKEEPER, AND CRANE ENGINEER
When the defendant on February 10, 1922, concluded not to go forward with the work, directions were issued to the plaintiff to remove all its property from the site of the work. The plaintiff contends that this order compelled the dispatch of the above-named employees from Pittsburgh, Pa., to the site of the work in order to comply with the directions. This item also went before the board of changes and was favorably recommended. The Chief of the Bureau of Yards and Docks and the Comptroller General disallowed it for the same reasons stated in the foregoing items. We do not think it is allowable. The contract required the plaintiff to remove its material, plant, and equipment from the site of the work when it was completed, and the only effect of the directions complained of is that the men engaged in active work might have removed the same *365 if work continued. This argument, we think, is unavailable. The plaintiff agreed to the suspension, and obligated itself to do precisely what was done by agreeing to the terms -of the contract. As we view it, the plaintiff simply did at ran earlier date what it would have had to do at a later one, i. e., remove the plant and equipment from the site.
SWITCHING CHARGES
Cars of steel consigned to plaintiff were placed by rail-Toads at points distant from the place the steel was to be used. Switching tracks were available to transfer such -consignments to the points where the steel was to be erected. The plaintiff was prevented from using its own locomotives to perform this service because the contract expressly limited the field in which its own locomotives might go. After contract No. 3604 was signed by the parties it was agreed between them that the defendant would perform this switching service at its own expense, because under the contract the plaintiff could not perform it. The matter was to be dealt with as a change in the provisions of the contract. Notwithstanding this agreement, the defendant deducted from the plaintiff’s special deposit fund the sum of $1,693.24, the alleged cost of performing the switching services. The plaintiff applied for a refund of the deduction. The board of changes acting upon this item on June 30, 1922 (Finding XXII), found that “It was the distinct understanding that the Government was to do all switching and consequently above claim is believed to be just.” The Chief of the Bureau of Yards and Docks approved the findings of the board and directed a refund of the item, and it would have refunded the same had not the disbursing officer in February, 1922, closed the plaintiff’s special deposit account. The plaintiff was directed to present his claim for this item to the Comptroller General for allowance. The Comptroller General disallowed it. The defendant contends that the court is powerless to allow the item because it is the result of an oral agreement between the parties, and the contract expressly prohibited oral agreements which modified the contract. Paragraph 19 of the general provisions did prohibit modifications of the con *366 tract by oral agreements, and if the action of the board of changes is not sufficient to give the transaction validity the defendant is right. Paragraph IT of the general provisions is the paragraph providing for changes. The finding states that “ this matter was to be dealt with as a change in the provisions of contract No. 3604.” While the facts do not disclose a strict compliance with paragraph 17, they do, we think, clearly disclose that the amount involved in the change exceeded $500; that a board of changes passed upon the same, and the Chief of the Bureau of Yards and Docks approved it and directed the refund. Unquestionably it was agreed that the defendant should pay this expense and that the matter would be dealt with as a change under the contract. When it came to a matter of settlement it was so dealt with, and we think the item is allowable. The amount is $1,693.24. This sum will be included in the judgment.
replacement oe bolts and rivets
Finding XXIII. In December, 1920, the plaintiff’s progress toward completion of the contract was halted by the defendant’s failure to furnish foundations. On the above date resumption of work was contemplated within a short time. However, it was delayed until June, 1921. During the. interim the plaintiff’s bolts and rivets were placed in kegs and boxes, and means for their security and shelter from rains provided. When the plaintiff returned to the site to continue work many of the boxes had been broken open, some portion of the contents taken, and the remainder were unfit for use then because of rust and deterioration. The plaintiff and defendant were in accord as to their uselessness and agreed that new material of the character and kind should be supplied and the old material taken over by the defendant. The defendant did take over the old material and the plaintiff supplied new material in its stead. It is, we think, a legitimate inference that the work could not have gone forward in the way and manner it should have if this had not been done. There is no disagreement as to the extra cost of this material. The defendant does not contest the cost, viz,' $1,905.23. The board of changes construed this *367 item as one for unliquidated damages and outside its jurisdiction to consider. The Chief of the Bureau of Yards and Docks approved the board’s findings. The plaintiff presented the item to the General Accounting Office and it was ■disallowed on the ground of general nonliability for any •delays upon the part of the defendant.
One defense put forward is rested upon the theory that the increased rate of pay provided in contract No. 3604Y is ■compensatory and so intended for losses occasioned by anticipated and past delays of the defendant. Prior to the •date of contract No. 3604Y the plaintiff had completed about ninety per cent of the contract work and removed from the site of the same. Obviously ten per cent remained to be •completed, but while the percentage was small, the volume involved the furnishing, erection, and painting of 2,559 tons •of steel, a task of magnitude. The plaintiff under the terms of contract No. 3604Y was to proceed in accord with the terms of contract No. 3604, the first contract in the case. Subsequent to the execution of contract No. 3604Y the defendant failed to observe its terms by rendering it impossible for the plaintiff to prosecute work thereunder without incurring great loss. The record furnishes no evidence of delays as such, delays which the parties contemplated and which were taken care of by the contract provisions, such as changes in the specifications as to type of foundations, materials to be used, etc. The defendant did not apparently know what it wanted to do and the contract did not authorize an indefinite suspension of all work, an interference that precluded progress and involved the plaintiff in irreparable loss. The increase in price was to cover the .added expense of returning to the site and completing performance of the contract according to its provisions. The new consideration was not payment of unliquidated damage claims. It was, we think, an expressed consideration for finishing an unfinished job which the plaintiff had, with the consent of the defendant, abandoned and to which it was under no legal obligation to return. From the beginning to the end of this transaction the defendant’s officials with most commendable frankness recognized the plaintiff’s rights under *368 the contract, and did not and have not disavowed responsibility for its losses. Wherever the board of changes considered an item over which it thought it had jurisdiction the board recommended it favorably. This item will be included in the judgment.
LOSSES DUE TO TRACK CONDITIONS
Contract No. 3604 provided in paragraph 17 of the amended specifications that the Government would “ provide, for erection purposes, one standard-gauge track in each main aisle of all buildings.” This equipment was essential to orderly prosecution of the work, as the structural steel was to be placed in large part by locomotive cranes of great weight passing over these trades. The tracks were provided but they were not constructed in such a way as to bear the weight of plaintiff’s locomotive cranes and this defect caused considerable delay due to cranes leaving the tracks. As a result of delays occasioned by this fact the plaintiff’s work was carried over into the winter months, which necessarily handicapped the plaintiff and imposed additional cost of performance. The plaintiff claims a loss in this respect of $15,000. The plaintiff’s original claim for losses under this item was stated by it to be $8,987.35, which was considered by the board of changes and was approved by the board to the extent of $3,775.10, the amount expended by the plaintiff to maintain the tracks in proper condition for use, and the remaining sum for damages due to delay was not approved. The present record we think precludes the allowance of a greater sum than the amount expended to maintain the tracks. Losses due to delays occasioned by the necessity of repairing the tracks are not, we think, established with sufficient certainty to warrant judgment therefor. The obligation of the defendant to provide standard gauge tracks, we think, extended to providing adequate trackage to do the work in hand. The plaintiff had a right to rely upon this provision of the contract as sufficient in scope to permit its doing the character of work, with the essential facilities employed in so doing, without cost or expense to it. The defendant could not escape responsibility as to this *369 item by merely laying tracks concededly inefficient for'the purposes intended. No evidence is adduced which in any respect negatives plaintiff’s statement of facts that the tracks provided were not constructed in such a way as to allow the plaintiff to proceed with construction. On the contrary, plaintiff’s evidence is not contradicted by an officer of the defendant either in charge of the work or familiar with conditions at the time. Paragraph 18 of the specifications, reproduced in defendant’s brief and relied upon as covering this item, is, we think, applicable only to the named utilities for the use of which the plaintiff was to pay prevailing Government rates. It apparently has no reference to facilities to be supplied to the plaintiff by the defendant free from expense to the plaintiff. Paragraph 18 is in most respects a permissive provision, állowing the use of Government-installed utilities, and is foreign to a covenant to supply a utility provided for in the contract.
Judgment for plaintiff for $48,067. It is so ordered.
Williams, Judge; Littleton, Judge; and Green, Judge, concur.
Whalet, Judge, took no part in the decision of this case.-