LaRamose, Judge,
delivered the opinion of the court:
This is an action to recover damages for the alleged breach of a contract between plaintiff and the Bureau of Reclamation. Under this contract plaintiff agreed to perform earthwork and erect structures for an irrigation canal in the Deschutes Project in the state of Oregon, for the unit prices fixed and agreed upon in the contract. Plaintiff contends that the defendant has breached the contract in three instances: (1) failure of the Government to furnish reinforcing steel which resulted in delays for which the defendant is liable; (2) that delays resulted from an inadequate supply of labor for which the defendant is liable; and (3) that the Government is liable for excess costs incurred in concrete operations because the quantity of concrete actually used was less than the estimated quantity.
*3 Defendant contends that no liability exists; that there was no breach of the contract; that the delays for which damages are sought were unavoidable and were contemporaneous with other delays for which the Government was in no way responsible; and that resulting damages, if any, have not been established.
The facts briefly stated are as follows: This suit is brought on a construction contract in the usual form under which the Government agreed to furnish designated materials, including reinforcing steel, and the contractor agreed to furnish other materials and to perform the work. The contract consisted of 17 contract items at agreed unit prices for a total estimated consideration of $245,290.50. The contract was dated August 27, 1945, and notice to proceed was given on October 12,1945, thus fixing April 30,1946, as the completion date.
The prime contractor performed, with his own forces, eight items of the work consisting of excavation and related earthwork. On October 15, 1945, he subcontracted five contract items, including reinforcing steel and concrete, to J. D. Proctor, Inc. The prime contractor also subcontracted four other items of the contract to another party who does not appear in these proceedings.
Delays occurred which prolonged the contract work and the time of its completion. Plaintiff sought extensions of time due to unusually severe weather, difficulty in securing adequate labor, scarcity of form material which the contractor was to supply, contract changes, and lack of reinforcing steel which the Government was to provide. One change order was issued which increased the contract price and extended the contract time by 21 days. Three extra work orders were issued which increased the contract price with no change in the completion date.
All work under the contract was completed on August 6, 1946. The completion date of the contract was extended by the contracting officer 77 days (in addition to the 21-day extension for the work covered by change order) for delays of the Government for which plaintiff was not chargeable *4 under the provisions of article 9 of the contract.[1] The delays for which extensions were granted were 54 calendar days due to the Government’s inability to furnish reinforcing steel, 20 calendar days for insufficiency of labor, and three calendar days for changes in the plans. No liquidated damages were assessed.
Final settlement between the prime contractor and the defendant was effected in January 1947. The release excepted from it three items for extra costs totaling $139,056.41, the details of which were supplied later. The claim thereafter presented to the contracting officer sought payment of extra costs allegedly incurred by the subcontractor, *5 Proctor, in the sum of $6,144.71 for placing reinforcing steel, and $109,502.12 for extra costs in connection with concrete structures, as well as the sum of $23,409.48 for added equipment rentals and overhead of the prime contractor. The contracting officer issued his findings of fact and decision denying the claim on December 15,1947. The contracting officer stated that the claims should be denied as claims for unliquidated damages, although he issued findings of fact on each item of the claim asserted. In connection with the claim for damages for delays resulting from late delivery of reinforcing steel, the contracting officer found that the Government made diligent efforts to secure the necessary reinforcing steel, but due to conditions beyond the control of the Government the steel could not be obtained without delay. On January 12, 1948, plaintiff filed an appeal dated January 7,1948, with the head of the Department, the Secretary of the Interior, from the decision of the contracting officer. In his appeal he contended that the claims asserted were not claims for unliquidated damages; that he was seeking and was entitled to an equitable adjustment under the provisions of articles 3 and 15 of the contract as a result of changes in the drawings or specifications; and that the decision of the contracting officer was not supported by the provisions of the contract or by his findings of fact. The decision of the contracting officer was affirmed by the duly authorized representative of the head of the Department, the Solicitor of the Department of the Interior.
Plaintiff now seeks to recover from the Government damages for himself and his subcontractor, Proctor, resulting from delays for which the contracting officer granted extensions of time under article 9 of the contract; viz, 54 days for late delivery of reinforcing steel and 20 days for inadequate labor, together with damages for extra costs in connection with its concrete operations on the ground that the actual quantity of concrete was less than defendant’s estimate.
The question on which this case turns is: Did the Government obligate itself to pay damages to the contractor because of delay in furnishing material and labor together with excess costs incurred in concrete operations?
*6 Because of the more complex problem presented by the first contention, we will first take up the question of liability of the Government for excess costs incurred in concrete operations. We feel that the plaintiff has presented no legal basis for recovery upon this claim. Any liability of the Government was specifically excluded by the provisions of the contract. Specification 4 (finding 5) provides:
The quantities noted in the schedule are approximations for comparing bids, and no claim shall be made against the Government for excess or deficiency therein, actual or relative. Payment at the prices agreed upon will be in full for the completed worlc and will cover materials, supplies, labor, tools, machinery, and all other expenditures incident to satisfactory compliance with the contract, unless otherwise specifically provided. [Italics supplied.]
Specification 49 (finding 5) provides:
* * * Some of the drawings included in these specifications are typical only of the structures to be constructed and the detail dimensions of the structures as they are to be constructed will be fixed by the contracting officer to adapt the structures to the existing conditions at the structure sites, and the contractor shall be entitled to no additional allowance above the unit prices bid in the schedule by reason of the dimensions fixed by the contracting officer or by reason of any modifications or extensions. * * *
We hold that the provisions above quoted are plain and unambiguous. Plaintiff is bound by them and is, therefore, not entitled to recover on this claim.
Plaintiff next contends that it suffered damage because of delays resulting from an inadequate supply of labor and that defendant is liable. We find no proof in the record that the Govermnent was negligent in providing labor. Furthermore, we find no instance in which plaintiff complained about labor shortages until time extensions were requested to avoid imposition of liquidated damages. Under the circumstances, and because of a complete failure of proof, we believe there was no breach of contract for which the Government can be liable on this claim.
*7 Plaintiff’s first, and we believe most serious, contention is that the failure of the Government to furnish reinforcing steel resulted in delays for which the defendant is liable.
We use the well-chosen words of Judge Littleton in the case of Chalender v. United States, 127 C. Cls. 557:
Generally, even though the Government may fail for justifiable reasons to secure timely delivery of materials which under a construction contract it is required to furnish, no liability for resulting delays will attach, unless it can be found that its representatives were at fault. U. S. v. Foley, 329 U. S. 64; Barling v. U. S., 126 C. Cls. 34. Cf. Torres v. U. S., 126 C. Cls. 76.
We believe there was fault on the part of defendant in this case.
Again, quoting from the Chalender case, supra:
There is present, in a contract such as this one, an implied obligation on the defendant that it will not do that which will hinder the contractor in the performance of the contract. When the contractor is delayed by a negligent act chargeable to the government, it is a breach of this clearly implied obligation, and the government is liable for the damages sustained by the contractor because of the delay. Fuller v. U. S., 108 C. Cls. 70; Kehm Corp. v. U. S., 119 C. Cls. 454. Cf. J. J. Kelley Co. v. U. S., 107 C. Cls. 594
In the absence of evidence to the contrary, when one party agrees to furnish particular materials to be used by the other, he must be held to have agreed “to furnish them in time to be installed in the ordinary and economical course of the performance of the contract.” Walsh v. U. S., 121 C. Cls. 546, 554-555.
In this case defendant is guilty of just such a breach.
Defendant agreed to furnish the reinforcing steel for this project. Unquestionably this was an urgent job. Plaintiff had a right to believe the reinforcing steel would be furnished by the Government in time to complete the job within the contract time, and this the Government failed to do. This very important fact was decided by the contracting officer, who granted an extension of time for this specific failure.
Defendant contends that this case is on all fours with the case of United States v. Foley, supra. We believe not. In *8 this case we find that the defendant was negligent and at fault. The evidence establishes that defendant was negligent in failing to furnish sufficient reinforcement steel to enable plaintiff to perform the contract in the specified time in an orderly and efficient manner. Notwithstanding the urgency of this job, the shortness of the time to perform it in, and the vitalness of the reinforcement steel in the performance of the job, defendant (1) did not advertise for bids on the steel until September 4, 1945; (2) upon receiving no bids from any of the 20-odd steel companies invited to bid, defendant only readvertised for 80,000 pounds when it could and should have obtained the estimated 264,000 pounds needed for the job, or at least another 80,000 pounds; (3) made no effort to obtain more than the 80,000 pounds of steel for the job until November 30, 1945; (4) informed plaintiff that more steel had been ordered when in fact it had not; (5) did not authorize for an extended period after its arrival the use of various quantities of steel that defendant and plaintiff had secured in 1946; and (6) did not place orders for the steel, with delivery being delayed if desired, while the steel could still have been obtained under priorities. The evidence also shows that plaintiff could have obtained the steel as an accommodation, as it subsequently in fact did, had defendant apprised plaintiff of its inability to obtain the steel. Also, defendant’s agents, who were in constant contact with various steel companies’ representatives, were apparently oblivious to the shortage of this type steel caused by the steel companies’ desire to manufacture other and more profitable types of steel.
Under the circumstances defendant failed to act diligently and its negligence directly caused the delay here complained of. There is no provision, or room for implication, in the contract permitting defendant to negligently delay the performance of it. On the contrary, we believe that under the circumstances there was an implied warranty upon the part of the Government to provide necessary steel in order that plaintiff could complete the contract in the specified time, and the negligent failure to do so was a breach thereof. These facts distinguish this case from that of United States v. *9 Foley, supra; W. E. Barling v. United States, 126 C. Cls. 34; Otis Williams & Co. v. United States, 120 C. Cls. 249.
The delay occasioned by the negligent failure of defendant to provide reinforcement steel as required caused both the prime contractor and the subcontractor to incur costs which would not otherwise have been necessary.
We find that plaintiff is entitled to recover the costs occasioned by the delay of the defendant in furnishing necessary reinforcement steel.
The case is referred to a Commissioner of this court to determine the amount of such costs which plaintiff is entitled to recover.
Madden, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OE PACT
The court, having considered the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. During the pertinent times hereinafter mentioned, William C. Thompson, the plaintiff herein, was a resident of the city of San Francisco, California, and was engaged in the construction business.
2. After defendant had invited bids and plaintiff had submitted a bid, plaintiff and defendant, acting through the Chief Engineer of the Bureau of Reclamation, entered into a contract dated August 27,1945, designated as Contract No. 12r-15498, by the terms of which plaintiff, in consideration of the payment of the unit prices set out in said contract totaling an estimated $245,290.50, covering 17 items of work, agreed to furnish the materials and perform the work for the construction of earthwork and structures for certain irrigation canals designated as lateral M-43 and sublaterals, Deschutes Project, Oregon, in strict accordance with the specifications, schedules, and drawings prepared by defendant and designated as Specification No. 1100, which were made a part of said contract. Correct copies of said contract and specifications were received in evidence and are made a part hereof by reference.
*10 3. By the terms of said contract the work was to be completed within 200 calendar days from the date of receipt of the notice to proceed. Such notice was received by plaintiff on October 12, 1945, thus fixing April 30, 1946, as the completion date of the contract. All work was satisfactorily completed on August 6,1946. Defendant granted extensions of time totaling 98 days, as will be further explained in subsequent findings, and no liquidated damages were assessed.
4. The contract in this case involved the construction of a portion of a system of irrigation canals in the Deschutes Irrigation Project, State of Oregon, by the plaintiff for the Bureau of Reclamation, Department of the Interior. All work in the Deschutes Project was under the supervision of the Bureau’s project construction engineer who maintained headquarters at Bend, Oregon. Resident engineers and inspectors in charge of construction were assigned to each contract in the project for supervising and inspecting the work under construction. The irrigation project comprised the construction of a main canal, approximately 50 miles in length, and the construction of numerous lateral and sub-lateral systems for distribution of water from the main canal to the farm lands in the surrounding areas. The M-43 lateral and sublaterals of the irrigation project were constructed under the contract here in suit; the construction of the main canal and other lateral and sublateral systems was performed by other contractors.
The portion of the lateral system covered by the contract now in suit was located approximately 30 miles north of Bend, Oregon. It was essentially an earth construction project involving the excavation for earthen irrigation ditches, excavation for structures, and the construction of numerous reinforced concrete structures throughout the reaches of the lateral and sublaterals. The M-43 lateral ran generally in a northerly direction from the point where the south end of the lateral joined the lower end of the main canal. Intervals of 100 feet were designated by station numbers, beginning at the south end of the lateral with station 0+00 and extending approximately 34,000 feet. Fifteen sublaterals of varying length, which were designated by suffix numbers, formed a part of the M-43 system. These *11 sublaterals were numbered in sequence commencing with sub-lateral M-43-0 at the south end of the main lateral to sub-lateral M-43-13 at the north end of lateral M-43.
The main lateral had an excavated base width of from 12 to 14 feet. That of the sublaterals ranged from four to six feet on the larger sublaterals to a base width of from two to three feet on the smaller ditches. The structures consisted of numerous reinforced concrete structures along the entire length of the main lateral and sublaterals including chutes, drops, turnouts, division boxes, checks, weirs and culverts as well as two larger reinforced concrete siphons on lateral M-43 where the lateral passed under the new Dalles-California Highway and under the combination crossing of the old highway and the Oregon Trunk Eailway.
5. The specifications contained, among others, the following pertinent provisions:
4. Quantities and unit prices. — The quantities noted in the schedule are approximations for comparing bids, and no claim shall be made against the Government for excess or deficiency therein, actual or relative. Payment at the prices agreed upon will be in full for the completed work and will cover materials, supplies, labor, tools, machinery, and ail other expenditures incident to satisfactory compliance with the contract, unless otherwise specifically provided.
9. Extras. — The contractor shall, when ordered in writing by the contracting officer, perform extra work and furnish extra material, not covered by the specifications or included in the schedule, but forming an inseparable part of the work contracted for. Extra work and material will ordinarily be paid for at a lump-sum or unit price agreed upon by the contractor and the contracting officer and stated in the order. Whenever in the judgment of the contracting officer it is impracticable because of the nature of the work or for any other reason to fix the price in the order, the extra work and material shall be paid for at actual necessary cost as determined by the contracting officer, plus 10 percent for superintendence, general expense, and profit. The actual necessary cost will include all expenditures for material, labor (including compensation insurance and social security taxes), and supplies furnished by the contractor, and a reasonable allowance for the use of his plant and equipment, where required, to be agreed *12 upon in writing before the work is begun, but will in no case include any allowance for office expenses, general superintendence, or other general expenses.
13. Protests. — If the contractor considers any work demanded of him to be outside the requirements of the contract, or considers any record or ruling of the contracting officer or of the inspectors to be unfair, he shall immediately upon such work being demanded or such record or ruling being made, ask, in writing, for written instructions or decision, whereupon he shall proceed without delay to perform the work or to conform to the record or ruling, and, within ten (10) days after date of receipt of the written, instructions or decision, he shall file a written protest with the. contracting, officer, stating clearly and in detail the basis of his objection. Except for such protests or objections as are made of record in the manner herein specified and within the time limit stated, the records, rulings, instructions, or decisions of the contracting officer shall be final and conclusive. Instructions and/or decisions , of the contracting officer contained in letters transmitting drawings to the contractor shall he considered as written instructions or decisions subject to protest or objections as herein provided.
23. G' ommencement, prosecution, and completion of work. — The contractor shall begin work within thirty (30) calendar days after date of receipt of notice to proceed and shall complete all of the work within two hundred (200) calendar days from the date of receipt of such notice. Delays due to the operation of the National Priorities System and/or action of the War Manpower Commission becoming effective subsequent to the date of the bid will be considered to be delays due to unforeseeable causes and beyond the control of the contractor. The construction covered by these specifications has been authorized by the War Production Board, and preference rating AA-3, dated April 11,1944, serial No. 103,845, has been assigned for the procurement of materials and equipment which will be physically incorporated in the rated project and for other materials required for the construction work but which will not become a part of the completed work. The contractor will, upon request, be authorized to apply the assigned rating for such of the above-described materials as he is required to furnish. In authorizing the work to be performed under these specifications, the War Manpower Commission has made the following limitations relative to the employees to be employed on the project:
*13 “* * * all hiring by contractors on this project shall be hired through the local United States Employment Service offices in order that proper controls can be set up to insure that no workers will be taken from lumbering, agriculture, or other construction or production jobs which have a higher priority rating.”
The capacity of the contractor’s construction plant, sequence of operations, method of operation, and the forces employed shall, at all times during the continuance of the contract, be subject to the approval of the contracting officer and shall be such as to insure the completion of the work within the specified period of time.
24. Liquidated, damages. — The damages that may result from any delay in completion of the work by the time agreed upon will be difficult, if not impossible, of ascertainment. If the work, or any part thereof, is not completed on or before the date fixed for its completion by the terms of the contract, the contractor shall pay to the Government, as fixed, agreed, and liquidated damages, the sum of one hundred dollars ($100) per day for each calendar day’s delay.
25. Materials furnished by the Government. — The Government will furnish cement, sand, and coarse aggregate for use in concrete; cement and sand for use in mortar; gravel for gravel pockets at weep pipes, for blankets under structures, and for gravel-filled trenches under structures; reinforcement bars; concrete pipe for turnouts and culverts; metal pipe for weep pipes; pipe and fittings for pipe handrails, together with rivets; pipe and fittings for air vents and drains; screwlift vertical gates with anchor bolts; metalwork for stop-plank guides; metal weir crests and gages; metalwork for adjustable weirs; waterproof felt for use at bridge abutments; lumber for permanent installation in structures, but not lumber for forms or other temporary construction ; paper sleeves for covering ends of reinforcement bars; metal water stops; plastic compound for coating water stops; anchor bolts; bolts, washers, nuts, spikes and nails twentypenny or larger in size to be used in the completed structures; paint and wood preservative ; and also all other materials not specifically mentioned in this paragraph or in paragraph 26 that will become a part of the completed construction work. Sand and coarse aggregate and gravel for gravel pockets at weep pipes will be delivered to the contractor in stock piles at stock-pile site No. 5, as shown on the drawings. Concrete pipe will be delivered to the contractor in the storage yard at Culver, Oregon. All other materials *14 furnished by the Government will be delivered to the contractor f. o. b. cars at the railway station most convenient to the work as determined by the contracting officer. The contractor shall haul all of the materials from the points of delivery to the work; shall provide suitable warehouses or other means of protection satisfactory to the contracting officer for such of the materials as, in the opinion of the contracting officer, require storage or protection; and will be charged for any materials lost or damaged after delivery, except as otherwise specifically provided, the same amounts that the materials cost the Government at the point of delivery to the contractor. The contractor shall report to the contracting officer, in writing, within 24 hours after unloading, any shortage in or damage to materials when delivered. The contractor shall be responsible for the prompt unloading of materials delivered on cars and for proper care of the materials, and will be held liable for any demurrage charges incurred due to failure to unload cars promptly. The cost of unloading, hauling, storing, and caring for all of the materials furnished by the Government shall be included in the unit prices bid for the work in which the materials are to be used. The cost of handling and installing minor miscellaneous items of metal, timber, and other work for which specific unit prices are not provided in the schedule, shall be included in the unit prices bid for the work to which they are appurtenant. The contractor shall return to the Government at the railway station most convenient to the work or at points convenient to the work, as directed by the contracting officer, all unused materials, and will be charged for any materials not used and not returned the same amounts that the materials cost the Government at the point of delivery to the contractor.
49. Construction of structures. — The structures to be constructed will include checks, chutes, drops, siphons, weirs, turnouts, bridges, culverts, and division boxes. The structures will be located at various points along the laterals as shown on the drawings or as designated by the contracting officer. The order of construction of the structures and the construction of structures in advance of or after the performance of lateral excavation shall be subject to the approval or direction of the contracting officer. All structures shall be built in a workmanlike manner and to the lines, grades, and dimensions shown on the drawings. The contractor shall place and attach to each structure, all timber, metal, or other accessories necessary for its completion, as shown on the *15 drawings. The cost of such work, for which specific unit prices are not provided in the schedule, shall be included in the unit prices bid in the schedule for the work to which it is appurtenant. Some of the drawings included in these specifications are typical only of the structures to be constructed and the detail dimensions of the structures as they are to be constructed will be fixed by the contracting officer to adapt the structures to the existing conditions at the structure sites, and the contractor shall be entitled to no additional allowance above the unit prices bid in the schedule by reason of the dimensions fixed by the contracting officer or by reason of any modifications or extensions. The dimensions of each structure as shown on the drawings will be subject to such changes as may be found necessary by the contracting officer to adapt the structure to the conditions disclosed by the excavation or to meet other conditions. Where necessary, as determined by the contracting officer, the contractor will be furnished additional detail drawings of the structures to be constructed.
74. Reinforcement bars. — Steel reinforcement bars shall be placed in the concrete wherever shown on the drawings or where directed by the contracting officer. The reinforcement bars will be furnished to the contractor by the Government as provided in paragraph 25. Unless otherwise shown on the drawings or directed by the contracting officer, measurements made in placing the bars shall be to the centerlines of the bars. jBefore the reinforcement bars are placed, the surfaces of the bars and the surfaces of any metal supports for reinforcement bars shall be cleaned of rust, scale, dirt, grease, or other foreign substances which, in the opinion of the contracting officer, are objectionable. Heavy flaky rust and mill scale that can be removed by firm rubbing with burlap or equivalent treatment are considered objectionable. After being placed, the reinforcement bars shall be maintained in a clean condition until they are completely embedded in the concrete. The Government will make every reasonable effort to have the reinforcement bars delivered to the contractor in good condition, but this shall not relieve the contractor from full responsibility for the condition of the bars immediately prior to covering them with concrete. Reinforcement bars shall be accurately placed and secured in position so that they will not be displaced during the placing of the concrete, and special care shall be exercised to. prevent any disturbance of the reinforcement bars in concrete that has already been placed. Metal chairs, metal *16 hangers, metal spacers, or other metal supports satisfactory to the contracting officer may be furnished and used bv the contractor for supporting reinforcement bars. Payment for placing reinforcement bars will be made at the unit price per pound bid therefor in the schedule, which unit price shall include the cost of furnishing and attaching wire ties and metal supports if used and of unloading, hauling, sorting, storing, cutting, bending, cleaning, placing, and securing and maintaining in position all reinforcement bars, as shown on the drawings or as directed by the contracting officer.
6. The contract contained, among others, the following pertinent provisions:
Article 3. Changes. — The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. No change involving an estimated increase or decrease of more than Five Hundred Dollars shall be ordered unless approved in writing by the head of the department or his duly authorized representative. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered : Provided, however, That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the head of the department or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.
Article 5. Extras. — -Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order.
Article 9. Belays — Damages.—If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any *17 extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. If the contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event the actual damages for the delay will be impossible to determine and in lieu thereof the contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted the amount as set forth in the specifications or accompanying papers and the contractor and his sureties shall be liable for the amount thereof: Provided, That the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the contractor shall within 10 days from the beginning, of any such delay (unless the contracting officer, with the approval of the head of the department or his duly authorized representative, shall grant a further period of time prior to the date of final settlement of the contract) notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such ap *18 peal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.
ARTICLE 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting ofiicer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed.
7. One change order was issued which increased the contract price by a lump sum of $9,375.65 and extended the time for completion of the work 21 days. Three extra work orders were issued which further increased the contract amount by $1,280.68 with no change in the time for completion.
8. On or about October 15, 1945, plaintiff subcontracted five items of his contract with the defendant to J. D. Proctor, Inc. (sometimes hereinafter referred to as Proctor), a California corporation with its offices in Richmond, California. The work so subcontracted consisted of contract items 9, 10, 11,12, and 17 involving concrete in structures, placing reinforcement bars, dry rock paving, erecting timber in structures and installing gates and miscellaneous metalwork.
9. Plaintiff performed, with his own forces, the work involved in contract items 1 through 8 consisting of excavation and related work such as backfill, compacting and overhaul» Contract items 9 through 12 and 17 were subcontracted to J. D. Proctor, Inc., as hereinbefore set forth, and performed by the subcontractor and its subcontractor. Contract items 13 through 16, laying concrete pipe, were also subcontracted by plaintiff to a Mr. Latham.
10. The plaintiff, prime contractor, is suing to recover damages incurred by himself and his subcontractor, Proctor.
Neither the plaintiff nor any of his representatives at the site of the work during construction appeared in these proceedings. No proof whatever was offered by the prime contractor in support of his claims asserted in the petition despite the fact that the plaintiff’s proof was presented at the city in which he resides.
*19 11. This was an urgent job. There were about 400 structures to be erected by plaintiff and they varied in size from 1 to 50 cubic yards of concrete and were scattered throughout the length of lateral M-43 and the sublaterals. The specified reinforcement in the concrete was deformed steel reinforcing bars %" and in diameter. The deformation consisted of ridges on said bars.
12. The estimated requirements of reinforcing steel for the job as estimated by defendant before bids were invited on such job was 264,000 pounds of deformed reinforcing steel. (This was the quantity stated in the specifications issued before bids.) Bids for the job were invited July 5, 1945, and were opened on August 2,1945. The contract is dated August 27,1945, and defendant issued the notice to proceed on October 12, 1945. On September 4, 1945, defendant sent invitations to 20-odd steel companies inviting bids to be opened on September 14, 1945, for 80,000 pounds of reinforcing steel required for the job. No bids were received. Some of the bids were returned by the steel companies with a letter stating that they were unable to furnish the steel at that time due to the condition of their mills.. Defendant read-vertised and received a few bids. The contract for said 80,000 pounds of steel was awarded on October 5, 1945, and such steel was delivered to the job in late October 1945. Defendant could have procured all the steel for the job at that time had it asked for bids on the full amount required for the job. However, it was not until November 30, 1945, that defendant asked for bids to be opened on December 11, 1945, for the remainder of the required steel. No bids were received upon such invitation. The remainder of the steel consisted of the same sizes, shapes and kinds as the 80,000 pounds. Defendant at the time it procured the 80,000 pounds could have safely bought all of the remainder of the steel for this job or if it desired could have procured 90,000 pounds in addition to the 80,000 pounds. The reason given by defendant for its failure to procure all of the steel at the time that it procured the 80,000 pounds was that defendant’s engineers had failed before November 20, 1945, to calculate the approximate amount of steel required for the job. No reason is shown why such amount was not calculated earlier. *20 The matter had been pending before defendant’s engineers for a long time, in fact since the engineers began to prepare the drawings which were made a part of the specifications and these drawings were begun and completed long before bids were invited on this job. This is also shown by the dates of approval of the contract drawings. The remainder of the steel sought by defendant was standard %" and straight deformed reinforcing bars in 40-foot lengths. This was steel that was much used by defendant on standard structures as well as special structures and if defendant had procured more than might finally be required for this job it could have been transferred for use on other jobs as was frequently done by defendant. The specifications contemplated that of the materials furnished by defendant some would not be used on the job and such surplus was to be returned to defendant by plaintiff.
13. Plaintiff through its subcontractor planned to begin work on the structures by the fabrication of forms and reinforcing steel so that it could proceed to the placement of reinforcing steel and pouring of concrete in the structures on lateral M-4S near the main canal, at the same time placing the steel and pouring the concrete in the nearby structures both large and small on lateral M-43 and nearby sublaterals, thus proceeding out lateral M-43 and the nearby sublaterals to the end of the work. In this way there would be an efficient reuse of forms and of the concrete pouring equipment and forces.
14. When Proctor, acting for plaintiff, early in November 1945, arrived to start work on the structures about 40 tons of reinforcing steel had been delivered to the job by defendant and defendant advised that it expected more to arrive at any time. This was soon fabricated by Proctor and about the middle of December 1945, upon complaint to defendant about the lack of steel, defendant advised that the steel had been ordered and that it would arrive any time then. Defendant did not advertise for bids on the remainder of the steel for this job until November 30, 1945, such bids to be received on December 11,1945. Such invitation stated that “Shipment within 15 calendar days is desired” but left it to bidders to state when shipment would be made and stated *21 that “Time of delivery may be considered in making award.” Defendant readvertised for bids on said steel on December 17,1945, and again on January 7,1946, again on February 4, 1946, and again on February 21,1946.
15. On January 25, 1946, defendant furnished to the job 47,000 pounds of smooth (not deformed) round tensile steel rods. There was no 3/y steel and no smooth (not deformed) steel provided for by the specifications or drawings. It was not until the latter part of March 1946, that defendant advised or directed plaintiff or Proctor where to use said 47,000 pounds of steel.
On January 31,1946, defendant furnished 2,000 pounds of y2" steel which was used up in about half a day. After much delay by defendant in furnishing the steel Proctor asked that he be permitted to shut down the job until the steel was on hand but defendant refused and advised that if Proctor did this defendant might have others finish the work.
On February 2,1946, defendant furnished to the job 24,000 pounds of steel. There was some of it y2" in diameter, but more of it was %" in diameter. Since both sizes were required by the specifications and drawings for most of the structures, all of the %" steel could not be used until more y2" steel was procured.
16. Plaintiff and Proctor had planned to pour at least 50 cubic yards of concrete per day. By the middle of January plaintiff and Proctor had the plant, equipment, men and forms to pour 50 cubic yards per day but the lack of reinforcing steel prevented them from doing so.
17. No more steel having been delivered after February 2, 1946, plaintiff through Proctor both before and after that date frequently complained to defendant and was at first advised by defendant that the steel had been ordered and would arrive most any day, but about February 6, 1946 admitted that it was unable to furnish the steel. Whereupon Proctor offered to go to San Francisco to see if he could procure the steel and defendant advised that if Proctor could procure the steel defendant would buy it if it could be bought at the O. P. A. price. Proctor was able to get 40 tons of %" and rods in San Francisco and was author *22 ized by defendant to procure tbe same. This 40 tons of steel arrived at the job on February 18,1946.
The specifications and drawings did not provide for the use of 14", or %" steel. It was not until the latter part of March 1946, that defendant released to plaintiff the }4", the and the %" steel and authorized the use of such sizes and directed and advised plaintiff or Proctor where and how such sizes might be used.
18. The delay by defendant caused delay and increased costs to plaintiff and to Proctor. They could not fabricate the steel until it was furnished by defendant and until defendant advised or directed as to where and how the the and the %" steel was to be used. The steel could not be placed in the forms until fabricated. The concrete could not be poured in the structures until the steel was placed.
By January 14, 1946, plaintiff and Proctor had the forms fabricated, had plant, equipment, and men on the job to fabricate and place the steel and pour at least 50 cubic yards of concrete per day but from that time until March 29, 1946, when steel was furnished and released by defendant and defendant advised and directed where and how the steel was to be used plaintiff and Proctor were delayed by defendant.
At the time that only 40 tons of steel had been furnished by defendant and defendant incorrectly advised that the rest of the steel had been ordered and would be delivered any day plaintiff and Proctor could have procured the needed steel elsewhere if they had known that was not true.
The delay by defendant in furnishing the steel delayed the completion of the structures on the job at least 54 days and the contracting officer determined that such delay was 54 days and granted an extension of time of 54 days on that account.
19. On March 21, 1946, the plaintiff notified the contracting officer by letter of what he called setbacks and delays due to the following causes:
1. Unusually severe weather.
2. Difficulty in securing adequate labor.
3. Scarcity of form material, particularly lumber.
4. Lack of adequate supply of reinforcing steel and reinforcing details.
*23 The letter requested an extension of time for completion of the contract work.
Again on April 29, 1946, the plaintiff’s superintendent at the site of the work and the superintendent of the subcontractor, Proctor, addressed a further letter to the contracting-officer requesting an extension of time for completion of the work for substantially the same reasons, although in greater detail.
A further letter from the plaintiff was addressed to the contracting officer on August 1, 1946, requesting 125 days’ extension of time. In this letter (which enclosed a copy of a letter from his subcontractor, Proctor) the plaintiff explained the reasons why he had been delayed and listed the causes therefor under the following headings:

Delay

Weather_ 35 days
Labor supply_ 7 days
Alterations of contract_ 40Ys days
Moving equipment_ 15 days
Structure work (shortage in reinforcing steel)_141 days
20. The contracting officer on October 2, 1946, issued his findings of fact as to the causes and extent of delays with particular reference to the matter of liquidated damages. By such findings of fact the contracting officer granted an extension of 77 days for completion of the work which coincided with the actual completion of the work on August 6, 1946.
Regarding the delays due to the late delivery of Government-furnished reinforcement bars, the contracting officer’s findings of fact stated as follows:
14. The provisions of the contract required that reinforcement bars to be used in the work would be furnished by the Government. Regarding the late delivery of these materials the subcontractor for structures in its letter of July 31, 1946, attached as an enclosure to the contractor’s fetter of August 1, 1946, and marked “Exhibit 5b,” states, in part, as follows:
“* * * As stated above, our steel man arrived November 6, set up his shop, and working with less than half a normal crew had completed bending the 40 tons of steel on hand by December 15, and also had placed about half of it in the structures in the field by that date. *24 (We made our first pour of 28 yards on November 29, and by December 23 had completed a total pour of 249 yards to that date.)
“If the total tonnage of reinforcing steel had been delivered promptly by the government to the job, all cutting and bending would have been completed before January 14,1946, notwithstanding the bad weather, for we had sufficient forms ready for both large and small structures to have started intensive operations on January 14, so as to have completed our work on time, as set forth in the original specifications. We estimate that we lost 30 days working time on this operation prior to January 15, 1946, by the failure of the government to promptly supply this reinforcing steel as provided in the plans and specifications No. 1100. We also were later prevented from maintaining the progress schedule contemplated at the start of the job after January 15, 1946, by further loss of time due to this lack of reinforcing steel * *
15. The records show that reinforcement steel, other than that used on work under Order for Changes No. 1, was delivered to the contractor in the amounts and on the dates shown as follows:

A comparison of these dates with the chart of the contractor’s proposed and actual operations (Exhibit 5e), shows that during the period when bending and placing operations were being carried on, except for reinforcement required under Order for Changes No. 1, a total of 54 calendar days were lost due to the lack of reinforcement bars. The contractor’s concrete plant had a capacity of 80 cubic yards per day which was adequate for the amount of concrete required in the work and the rate of progress on structures was controlled by the amount of reinforcement bars available. Of the quantities of steel shown above a portion was of sizes which were not used in the work due to changes in the type and design of structures and therefore represents a greater amount of reinforcement bars than could be used in the work. From the foregoing it is found that due to the Government’s inability to furnish the contractor with reinforcement bars in the time required and in quantities sufficient to maintain a reasonable rate of progress, *25 completion, of the work was delayed fifty-four (54) calendar days and that such delay was due to unforeseeable causes, beyond the control, and without the fault or negligence of the contractor and is therefore excusable under the provisions of Article 9 of the contract,
The contracting officer summarized his findings of fact as follows:
16. From the foregoing statement of facts the following summary of findings is made:
(a) The original date for the completion of all work under the contract was April 30, 1946. Order for Changes No. 1 extended the contract time 21 calendar days, or until May 21, 1946. All work under the contract was completed August 6, 1946, thus constituting a delay of 77 calendar days in completion of the contract.
(b) It is found that any delays which may have resulted from inclement weather conditions were delays which are not excusable within the meaning of Article 9 of the contract.
(c) It is found that the contractor was required to procure labor through the United States Employment Service, and that due to the inability of that agency to make sufficient labor available for the performance of work within the time required under the contract, the contractor suffered a delay of twenty (20) calendar days, and that such delay was due to unforeseeable causes, beyond the control and without the fault or negligence of the contractor and is excusable, therefore, under the provisions of Article 9 of the contract.
(d) It is found that as a result of changes in plans, the contractor was delayed three (3) calendar days in the performance of the work and that such delay was due to unforeseeable causes, beyond the control and without the fault or negligence of the contractor. This delay is excusable, therefore, under the provisions of Article 9 of the contract.
(e) It is found that as a result of the Government’s inability to furnish materials at the time required, the contractor was delayed fifty-four (54) calendar days in the performance of the work under the contract, and that such delay was due to unforeseeable causes, beyond the control and without the fault or negligence of the contractor and is excusable, therefore, under the provisions of Article 9 of the contract.
(f) The total excusable delays from all causes considered herein is found to be seventy-seven (77) calendar days.
*26 17. In accordance with the provisions of Article 9 of the contract (United States Form No. 23, Eevised November 7, 1941), the time for performance of the work is hereby extended seventy-seven (77) calendar days.
18. A copy of these findings will be transmitted to the contractor for information with attention being invited to the right of appeal as provided in Article 9 of the contract. The appeal, if made, should be filed in this office within thirty (30) calendar days from the date hereof for transmittal to the Secretary of the Interior.
21. The record shows no appeal by the plaintiff from the foregoing contracting officer’s findings of fact.
22. Final settlement between plaintiff and defendant was made in January 1947. The release, executed by plaintiff, provided in pertinent part as follows:
* * * the contractor hereby remises, releases, and forever discharges the United States of and from all manner of debts, dues, sum or sums of money, accounts, claims, and demands whatsoever, in law and in equity, under or by virtue of the said contract, except as to my claims for extra Costs incurred in the total sum of $139,056.41 (See Reverse Side), a detailed analysis of which will be handed you shortly.
$ ‡ ‡ *

Extra costs claimed

Item No. 10 — Bending and placing operations_ $6,144. 71
Item No. 9 — Concrete in structures_ 109,502.12
Added equipment rentals and overhead 5/21/46 to 8/6/46- 23,409.58
Total- 139,056.41
23.On February 13,1947, plaintiff submitted a letter dated February 3,1947, from the contractor setting forth a detailed analysis of the schedules excepted in the release. Payment was claimed for extra costs which it is claimed were incurred by the subcontractor, Proctor, in the sum of $6,144.71 for contract item 10 (placing of reinforcing steel) and $109,502.12 for contract item 9 (concrete in structures), as well as the sum of $23,409.58 for added equipment rentals and overhead of the prime contractor. The claims of the subcontractor were computed by deducting the difference between what it estimated as the cost of these items at the time its subcontract *27 was entered into and tbe cost which it claimed had been incurred or allocated to the performance of the work. The claim on behalf of the prime contractor was comprised of the sum of $21,225.80 for equipment, general overhead, main office and field overhead, and $2,183.78 for unabsorbed overhead on concrete.
24. On December 15, 1947, the contracting officer issued his findings of fact and decision denying the claim in its entirety. Such findings of fact and the contracting officer’s decision are included in a document which is in evidence as plaintiff’s exhibit 14 and is hereby made a part of this finding. The contracting officer determined that the claims asserted should be denied as claims for unliquidated damages. Nevertheless he made findings of fact on each item of the claims asserted. Some of his findings are, and some are not, supported by substantial evidence.
25. On January 12, 1948, plaintiff filed an appeal dated January 7,1948, with the head of the Department, the Secretary of the Interior, from the December 15,1947, decision of the contracting officer. In his appeal, he contended that he was entitled to an “equitable adjustment” under the provisions of articles 3 and 15 of the contract; that the claims asserted were claims for equitable adjustment as to the amount due under the contract following changes in the drawings or specifications of the contract, and not claims for unliquidated damages; and that the decision of the contracting officer was not supported either by the provisions of the contract or by the findings of fact.
26. On July 9,1948, the Solicitor of the Department of the Interior, pursuant to authority delegated to him by the Secretary of that Department, affirmed the contracting officer’s decision of December 15, 1947, that plaintiff’s claim was for unliquidated damages.
27. The reinforcement steel to be furnished by the Government under the terms of the specifications was estimated at about 264,000 pounds (or 132 tons) of %-inch and %-inch round deformed steel bars for use as reinforcement in the concrete structures. The structures in which the reinforcement steel was to be used consisted of standard structures, *28 which were typical of structures used throughout canal laterals, and special structures, which were designed specifically for adaptation to this project. The specifications included drawings for many typical structures with the provision that detailed dimensions of structures as they were to be constructed would be fixed by the contracting officer to adapt the structures to conditions disclosed by excavation or to meet other conditions, and that additional detailed drawings would be furnished the contractor as deemed necessary by the contracting officer. The steel requirements for the standard or typical structures are ascertained from the bid or specification drawings without preliminary bar detailing or diagraming. The reinforcement requirements for the special structures are ascertained from the detailed working or construction drawings, which are used as the basis for the preparation of bar detailing, diagraming, and cutting lists. From this reinforcement bar detailing, the cutting and bending lists for use in field construction are prepared and the reinforcement steel purchase requirements are more exactly ascertained.
28. When the specifications for this contract were issued, the National Priorities System was in effect pertaining to the allocation and use of critical materials. The construction covered by the specifications had been authorized by the War Production Board and a preference rating of AA-3 had been assigned to the project for the procurement of materials and equipment. The specifications provided that delays, due to the operation of the National Priorities System or the War Manpower Commission, becoming effective subsequent to the date of bids, would be considered to be delays due to unforeseeable causes and beyond the control of the contractor.
29. The contracting officer’s findings that the completion of the work was delayed 54 calendar days by the Government’s inability to furnish reinforcement steel when required by the contractor are supported by substantial evidence, and it is found that the plaintiff and his subcontractor, Proctor, were delayed by the defendant in the prosecution of the work by 54 days on'account of the defendant’s inability to furnish reinforcement steel when required.
*29 The contracting officer found that defendant exerted diligent efforts to secure reinforcement steel. However, the contracting officer had already denied the claim on the ground that it was not compensable under the contract because it was for unliquidated damages. His decision was affirmed on appeal to the head of the department. The findings of the contracting officer with regard to the exercise of diligence by defendant are not supported by substantial evidence. The evidence establishes that defendant was negligent in failing to furnish sufficient reinforcement steel to enable plaintiff to perform the contract in the specified time in an orderly and efficient manner. Notwithstanding the urgency of this job, the shortness of the time to perform it in, and the vitalness of the reinforcement steel in the performance of the job, defendant (1) did not advertise for bids on the steel until September 4,1945; (2) upon receiving no bids from any of the 20-odd steel companies invited to bid, defendant only readvertised for 80,000 pounds when it could and should have obtained the estimated 264,000 pounds needed for the job, or at least another 80,000 pounds; (3) made no effort to obtain more than the 80,000 pounds of steel for the job until November 30,1945; (4) informed plaintiff that more steel had been ordered when in fact it had not; (5) did not authorize for an extended period after its arrival the use of various quantities of steel that defendant and plaintiff had secured in 1946; and (6) did not place orders for the steel, with delivery being delayed if desired, while the steel could still have been obtained under priorities. The evidence also shows that plaintiff could have obtained the steel as an accommodation, as it subsequently in fact did, had defendant apprised plaintiff of its inability to obtain the steel. Also, defendant’s agents, who were in constant contact with various steel companies’ representatives, were apparently oblivious to the shortage of this type steel caused by the steel companies’ desire to manufacture other and more profitable types of steel.
30. As has been shown in finding 20, the plaintiff was delayed for 20 days due to the inability of the United States Employment Service to furnish sufficient labor (see paragraph 23 of specifications, finding 5) for the performance *30 of the work within the required time. Since the labor involved was required for the performance of the subcontract work by Proctor, such delay of 20 days also applies to Proctor’s work.
31. The subcontract between the plaintiff and his subcontractor, Proctor, contained the following provision, among others:
Section 6. The contractor and subcontractor agree that any and all disputes that may arise between them shall be settled by arbitration, and the rights and obligations of each of them shall be as set forth in Specifications No. 1100 and in this contract.
32. The plaintiff’s contract with Proctor did not exonerate him from liability to Proctor for the failure to furnish the steel, and plaintiff has agreed to reimburse him for any damages recovered in his behalf.
33. The delay occasioned by the negligent failure of defendant to provide reinforcement steel as required, and the delay occasioned by the inability of the defendant to furnish the necessary labor for the performance of the work under the contract in suit, caused both the prime contractor and the subcontractor to incur costs which would not otherwise have been necessary. In order to determine the amount of such costs, an exhaustive study of the accounting records in evidence will be required. In the preparation of this report such study has been deferred pending a determination by the court of the question of the liability, if any, of the defendant for such increased costs.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is entitled to recover damages resulting from delayed delivery of reinforcing steel, and the plaintiff is not entitled to recover damages resulting from unavailability of adequate labor or damages for decreased concrete quantities.
The case is referred to a Commissioner of this court for stipulation or finding as to the amount of plaintiff’s damages.

 Article & of the contract reads as follows :
“‘Article 9. Delays — Damages.—If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. If the contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event the actual damages for the delay will be impossible to determine and in lieu thereof the contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted the amount as set forth in the specifications or accompanying papers and the contractor and his sureties shall be liable for the amount thereof: Provided, That the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, Including, but not restricted to, acts of God, or of the public enemy, acts of the Government, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the contractor shall within 10 days from the beginning of any such delay (unless the contracting officer, with the approval of the head of the department or his duly authorized representative, shall grant a further period of time prior to the date of final settlement of the contract) notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.”