Jones, Judge,
delivered the opinion of the court:
The plaintiffs as trustees for the stockholders of B. & R. Company, Inc., successors to Bates & Rogers Construction Company, instituted this suit to recover excess costs caused by delay in furnishing rights-of-way and easements for the construction of a dam on the Tuscarawas River near Dover, Ohio. The delay is alleged to have been the fault of the defendant.
Bates & Rogers Construction Company, hereinafter referred to as the contractor, agreed for an estimated consideration of $957,262 to furnish all labor and materials and perform all work required for the construction of the Dover *405 Dam, except that certain materials designated in paragraph 1-15 of the specifications were to be furnished by the Government.
The contract was to be commenced within 10 calendar days after receipt of notice to proceed, and to be completed within 700 calendar days thereafter. Notice to proceed was given June 5, 1935, thus fixing May 5, 1937, as the date for completion.
A progress chart was furnished by the contractor, indicating the intention of completing one-third of the concrete operations during the working season of 1935, the balance up to 95 percent to be completed during the working season of 1936, leaving only 5 percent to be poured after the second winter layoff, together with topping off and dressing up of the work.
At the time the contract was executed a branch of the Pennsylvania Railroad passed through the dam site on the left or south bank of the river, from 11 to 21 feet above the normal level of the river. The river was about 300 feet wide at this point, with sharp up-sloping banks on both sides.
The specifications contemplated that the north half of the dam, including monoliths 1 to 11 to the center of the stream, would be constructed first, after which the river would be diverted and the south half of the dam, including the remaining monoliths, would be constructed. The specifications provided that the south half of the dam might be constructed at the contractor’s convenience, provided its operations did not interfere with traffic over the existing line of the Pennsylvania Railroad and that it would be permitted to construct monolith No. 16 as soon as the existing railroad line should be abandoned. The specifications stated “it is estimated that this line will be abandoned by or prior to March 1, 1936. The contractor will not be allowed to construct the second cofferdam and the remaining dam monoliths Nos. 12 to 15 inclusive, until the existing railroad line is abandoned, or until authorized in writing by the contracting engineer and subsequent to completion of work in the first cofferdam as previously specified.” They also stated that in case the relocation of the Pennsylvania Railroad was not completed by March 1, 1936, the contracting officer would extend the time *406 for completion of plaintiff’s contract. The railroad was to be relocated at approximately 70 feet above the river or at the elevation of the top of the dam.
The major part of the work of relocating the railroad, which required the removal and relocation of about 12 miles of track, was covered by a contract between the United States and the Geo. W. Condon Company dated March 29, 1935, though there were other contractors involved. On June 6, 1935, the contractor in the instant case arrived on the job and began the work of clearing the site of timber, drawing up plans for the construction plant and preparing to bring on its equipment. Excavation was begun July 1, and construction of the north cofferdam July 5. The cofferdam was unwatered August 2. There was a short delay on account of a flood overtopping the cofferdam. It was necessary to redesign the steel trestles in order to make them stronger. In the meantime cranes were used. This for a short time slowed down the progress of the work. In an effort to keep up with its progress schedule the contractor continued to pour concrete until December 24, 1935, although it had anticipated discontinuing not later than December 1. This brought it within 10,000 cubic feet of its schedule, about one month’s plant capacity. In March 1936 when the contractor expected to resume pouring concrete it had no aggregate on hand, and because of winter conditions was unable to secure delivery thereof until April. However, prior to that time the defendant had notified the contractor that the railway would not be relocated until about May 15, so this delay was immaterial. Pouring of concrete was resumed on April 18,1936.
During the spring of 1936 floods caused a suspension of the work, for which an extension of time of 8 days was granted. In July 1936 the contracting officer gave the contractor authority to divert the river through the north half of the dam and remove the first cofferdam. The river was diverted in August 1936. Rock faults were discovered which caused a further extension of time and an increase in the contract price. There were repeated delays in relocating the railroad. The engineer in charge notified the contractor that it would probably not be completely done until May 15, *407 1986, the completion date for removal was deferred from time to time and the railroad was not finally relocated until October 8,1936, more than 7 months after the time estimated in the specifications and more than 9 months after the time called for in the contract with the Geo. W. Condon Co. This greatly handicapped the contractor in the instant case, made it necessary to slow down its work, and increased its costs of operation.
The crux of plaintiffs’ complaint is that the contractor had undertaken a two-season contract and that because of the failure of defendant to have the railroad tracks removed by March 1, 1936, or within a reasonable time thereafter, the time within which the construction of the dam could have been completed was greatly extended and the cost thereof greatly increased, and that this being the fault of the defendant, they are entitled to recover the increased costs thus necessarily incurred, which they allege to be approximately $210,000.
The defendant answers with the plea that necessary delays and change orders made it impossible for the work to be substantially finished in the year 1936 and that it was not responsible for the delays in relocating the tracks of the Pennsylvania Railroad.
It is rather clear from the evidence that had the railroad been relocated within a reasonable time after March 1,1936, and had there been no delays and change orders, the contractor could have completed the contract practically in accordance with its original schedule. It is also clear, however, that because of floods, rock faults, and extra work and change orders which were the fault of neither party, it probably could not have finished before June 15, and possibly not before July 15, 1937. Taking all these matters into consideration, it is very evident that on account of the delays directly flowing from the failure to relocate the railroad tracks, the contractor was delayed at least 85 days. This delay of 85 days was conceded by the defendant’s engineer and the contracting officer.
There is much dispute as well as conflicting evidence as to the responsibility for other delays, and in view of the state of the record the plaintiffs should be confined on this *408 phase of the case to the damages which directly resulted from the 85 days’ delay.
Plaintiffs’ claim for damages was rejected by the contracting officer and on appeal was rejected by the Chief of Engineers who was the authorized representative of the head of the department.
The Chief of Engineers, while conceding that the failure to remove the railroad tracks caused a delay of 85 days, nevertheless rejected the claim on the ground that according to his interpretation of the provisions of the contract the defendant owed no obligation in respect to any excess costs that might be caused by any delay in the relocation of the railroad tracks.
Article 9 of the contract made the finding of the head of the department final as to the facts of delay and extension of time, but did not make such authority final as to the interpretation of the contract.
By the terms of the specifications it was estimated that the railroad line would be relocated by or prior to March 1,1936. It was on this basis that the contractor figured its bid, made its plans, provided its equipment, organized its work and prepared its progress schedule. The specifications further provided that in the event the relocation of the Pennsylvania Railroad was not completed by March 1, 1936, the contracting officer would extend the required date of completion by a period of time equal' to that lost by the contractor due to the delay after March 1, 1936.
In carrying out the contract for relocation of the railroad with the Geo. W. Condon Co. the defendant made 6 change orders, two of them major changes. The aggregate delay caused by these change ’ orders with the Condon Company was 243 days.
The first of these change orders provided for the building of an underpass upon a recently authorized state highway. This was to consist of a steel deck plate girder bridge, with concrete abutments and wing walls, with pile foundations and water-proofed concrete deck. By virtue of this one change order the contract period for the relocation of the railroad tracks was extended 90 days. Upon the request of the Condon Company the engineer ordered a suspension of *409 the work of relocation during the winter months. Finally on October 5, 1936, the authorization for removal of the tracks was turned over to the Pennsylvania Railroad Company itself, and it fininhed the removal of the tracks on October 8.
While according to the instant contract defendant was not specifically required to have the tracks removed by March 1, 1936, and while the contract with the Condon Company provided for change orders, we do not think that the defendant was authorized to completely disregard its obligation to the contractor, to consult its own convenience only, and to delay-indefinitely the removal of the tracks without any regard for the rights of the contractor and without any consideration for the tremendous extra expense that would thus be placed upon it.[1]
The contracting officer suggested that the contractor could have avoided some of the delays by moving across the tracks and doing the necessary excavating beyond them before the tracks were removed. A glance at the photographs of record in this case shows how impracticable such a procedure would have been. The slope was steep just beyond the tracks. The tracks were very close to the normal level of the river. It would have necessitated excavating in holes and with great danger of slides over the tracks. Deep holes would have been left on both sides of the tracks while traffic was still operating. In the event of floods it would have caused incalculable damage. So great was the danger of such a procedure that the contracting officer required that if the contractor chose to do this work before the tracks were removed, it agree in writing to be responsible for any damages that might thereby be caused. Such a state of facts takes most of the strength out of the plea of the defendant that the contractor could have proceeded with its work. The extra cost as well as possibility of great damage left the contractor no choice but to adjust its work in such a way as to await the relocation of the tracks.
While the defendant had a right to make changes under *410 the terms of the contract with the Condon Company, we do not believe it was justified in giving to the contractor notice to proceed and then doing such affirmative acts as suspending the work of the Condon Company through the winter months and ordering major changes which would entail great delays without any consideration for the increased burdens thus placed upon the contractor. Each of the parties to a contract has some obligation to respect the rights of the other party.[2] If the defendant had contemplated the major changes in the Condon contract, it should either have notified the contractor of those proposed changes or have delayed the notice to proceed.
The underpass which was the occasion of an extension of 90 days in the Condon contract and concededly was the cause of an 85 days’ delay in the instant contract could have been constructed after the removal of the tracks. The evidence shows that up to the time of the taking of testimony in this case, some two years after the completion of the contract, the underpass had never been used. No highway has ever been built at this point. The railroad could have been relocated according to the original plan and the underpass built later when and if a new road was definitely determined upon. The defendant should have known the damage which would be caused to plaintiffs by the delay occasioned by the construction of the underpass at that time. It wholly disregarded plaintiffs’ rights and its obligations to plaintiffs. This conduct was the cause of a delay of 85 days to plaintiffs, which delay was entirely the fault of the defendant.
There were other wrongful acts of defendant, heretofore referred to, which delayed the removal of the railway tracks, causing damages and excess costs, and for which defendant was responsible. However, since these acts ran concurrently, we think the damages should be confined to the period of 85 days. All in all, the record indicates a rather arbitrary disregard of the rights of the contractor and a disposition to lend it little assistance in carrying out the obligations of its contract.
*411 It is contended that the recent decision of the Supreme Court in the Rice [3] case is controlling, and should prevent •recovery by the plaintiffs. We do not think so. In that case the delay was caused by unforeseen conditions which were not the fault of anyone, and a method for making adjustments, in the event unforeseen conditions should develop, was specified in the contract. That remedy has been invoked. We do not construe the Bice case as holding that affirmative wrongful action or failure of the defendant to discharge its obligations under the contract could be cured by simply waiving liquidated damages. The liquidated damages clause is placed in the contract for the protection of the defendant. If it were held that the simple waiver of such a penalty clause were all the relief that could be secured by plaintiffs, regardless of the added expense of labor, bonds, interést, rental of machinery and other costs, and regardless of how long a delay might be occasioned by the defendant, then the plaintiffs would have no protection, from wrongful acts or from negligent failure of the defendant to perform its obligations under the contract. We do not think the officials of the defendant should be permitted to “kick the contractor all over the lot” and escape responsibility by merely waiving the right to collect liquidated damages, regardless of what the additional costs to him might be. If such a construction were made, it would certainly cost the defendant heavily in the form of higher bids in all future contracts. Neither the language of the opinion nor the issue involved in the Bice case justifies any such construction.
We find that defendant was wholly at fault in causing a delay of at least 85 days in the removal of the railroad tracks, and that plaintiffs are entitled to recover the excess costs of construction directly resulting from such delay.
In the state of the record it is difficult to measure the exact damages that were thus caused. Some of the items of plaintiffs’ claim are not clearly allocated. As to others, the proof is somewhat doubtful. After eliminating all uncertain and doubtful items, we find that the evidence clearly shows that *412 the plaintiffs’ damages by reason of the 85 days’ delay and directly connected therewith are at least $41,686.24.
As to the other phase of the contract, plaintiffs claim $16,054.44 on account of the delay of the defendant in securing rights-of-way and easements for clearing the reservoir area. These were to be furnished by the Muskingum Watershed Conservancy District. There were numerous delays in securing the necessary land and rights-of-way for this area. It was done piecemeal. . Some of it was secured very late in the operation of the contract, and a small part was never obtained. This delay caused the accumulation of logs and debris, and the necessity for doing the work little by little made it much more expensive and thus added to the cost of the contractor’s operations. The items of extra cost that were definitely proved as a result of this delay totalled $10,696.53.
However, the specifications provided that the rights-of-way were to be furnished by the Muskingum Water Conservancy District and included the statement that the right-of-way for the clearing of the reservo;” area would probably not be available prior to August 1935, and they contained the further provision that the Government would not be responsible for any delay in furnishing the grounds or right-of-way.
While it is true that the letter of award dated May 15,1935, addressed to the contractor and signed by the engineer in charge and advising the contractor that the titles to the necessary land for construction purposes had been secured, which letter was written after the preparation of the specifications, was probably calculated to lull the contractor into the belief that all the necessary lands and rights-of-way had been secured, a careful reading of the letter discloses that it is limited to the necessary land for construction purposes. While in a sense all of such land might be considered necessary since the accumulation of logs would interfere with the construction work, this is more or less incidental and in view of the very clear wording of the specifications advising that there would probably be considerable delay in securing this part of the ground for right-of-way, we think that plaintiffs are precluded from recovery for the additional cost due to the *413 delays in securing the grounds and right-of-way for the reservoir area. We reach this conclusion reluctantly, since it is manifest from the record that this phase of the matter was handled with little regard for the contractor’s problems. Apparently little effort was made on the part of the contracting officer or engineer in charge to hasten the securing of these lands. At any rate, their handling of the matter was very careless and indifferent. But in view of the plain wording of the specifications which were a part of the contract, we can find no legal way of permitting the plaintiffs to recover these losses.
It is a pleasure to read the record in connection with an important contract in which the contractor was thoroughly efficient, had adequate facilities and performed every part of its contract in a workmanlike manner. With the single exception of furnishing too light trestles, which caused a brief slow down, but which fault was promptly corrected, the contractor was not responsible for any of the delays. In an effort to make up for delays for which it was in no way responsible, it poured concrete out of season, worked around the clock, went to extra expense, and throughout the performance of the long contract its work was not only above criticism, but both its attitude and its work were highly commendable. The fact that in 1937 after the railroad tracks were relocated and the contractor could proceed unhampered it poured as much as 15,000 cubic yards of concrete in one month adds strength to the claim that, but for the delay in the removal of the tracks, it would have been substantially a two-season contract. It was compelled to slow down its work and incur excess costs because of irritating delays that might well have been avoided.
After reading the entire record, we are impressed with the fact that the contractor was damaged in a much greater sum than we are permitted to allow, and that while some of these damages were due to unforeseeable conditions, a considerable part of them was due to the action and lack of action of defendant’s officials in charge. We have limited the amount to items that were shown to.be the fault of the defendant in failing to comply with its obligations to the contractor and further limited it to the period of the *414 85 days’ delay and to the items that are definitely connected therewith. Plaintiffs are entitled to recover the sum of $41,686.24.
It is so ordered.
Madden, Judge; Whitaker, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.

 Carroll Electric Co. v. United States, 68 C. Cls. 500, 506; Detroit Steel Products Co. v. United States, 62 C. Cls. 686, 697, 698; Worthington Pump & Machinery Co. v. United States, 66 C. Cls. 230, 240.

 United States v. Speed, 8 Wall. 77, 84; United States v. United Engineering and Contracting Co., 234 U. S. 236.

 United States v. Rice and Burton, Receivers, decided November 9, 1942, 317 U. S. 61.