OZARK DAM CONSTRUCTORS, a Joint
Venture,

v.

**UNITED STATES.**

No. 143–54.

United States Court of Claims.

April 7, 1961.

Laramore, Judge, and Jones, Chief Judge, dissented.

John W. Gaskins, Washington, D. C., for plaintiffs. Paul E. McNulty and King & King, Washington, D. C., were on the briefs.

David Orlikoff, Washington, D. C., with whom was Geo. S. Leonard, Acting Asst. Atty. Gen., for defendant.

MADDEN, Judge.

The plaintiffs sue for damages alleged to have been caused them by the wrongful failure of the Government to furnish cement needed by them to maintain progress in their work of constructing the Bull Shoals Dam in Arkansas. They allege in their petition that the contract provided that the Government would supply the cement for the project; that the Government had contracted for the cement with a cement mill in Independence, Kansas, and had arranged for its transportation via the Missouri Pacific Railroad from Independence to Cotter, Arkansas, where the plaintiffs were to accept delivery of it on a railroad spur; that the plaintiffs had given due notice of what their cement needs would be for the period beginning September 19, 1949; that on November 3, 1948 the employees of the Missouri Pacific Railroad had voted to authorize a strike and on July 6, 1949 actually called a strike; that because a Presidential Emergency Board was appointed, the strike was postponed; that the employees rejected the settlement proposed by the Emergency Board and called the strike for September 9, on which date transportation over the Missouri Pacific Railroad ceased.

The petition alleged that although they were aware of the possibility of the strike, the defendant's agents took no steps to investigate alternative means of delivering cement; that the strike continued until October 24; that the operations of the plaintiffs were slowed down and finally almost completely closed down until October 31 when a shipment of cement was received; that the interruption of the plaintiffs' work increased their costs by $473,352.97.

We quote paragraph 14 of the plaintiffs' petition:

"14. During the Missouri Pacific Railroad strike it would have been practicable to have delivered the cement in bulk by another railroad to West Plains, Missouri and to have hauled the cement by truck 68 miles to the dam site. It would also have been practicable either to have transported the cement in bulk by truck from point of manufacture to the dam site or to have transported the same in bags by ordinary truck trailers from that distance, or any part thereof. Plaintiffs endeavored to be of assistance to defendant and expressed a willingness to undertake delivery of the cement to the site upon modification of the contract. Plaintiffs also brought to the site a trucker who investigated the possibility of delivery by truck. Defendant never made known to plaintiffs the quantity of the cement that it would permit to be trucked or hauled by other means or whether it would permit such transportation to continue for any period after the railroad strike had ended."

The Government made a motion to dismiss the plaintiffs' petition. The motion was based upon paragraph SC–11(c) (1) of the specifications of the contract, which said:

"The Government will not be liable for any expense or delay caused the contractor by delayed deliveries except as provided under Article 9 of the contract."

The court denied the Government's motion, 127 F.Supp. 187, 130 Ct.Cl. 354, and in its opinion said, in effect, that the allegations of the plaintiffs' petition described a situation in which the possible damage to the plaintiffs, if a strike occurred and no alternative means of delivering cement had been arranged, was

so great, and alternative means were so readily available, that the Government's inaction was so inconsiderate of the plaintiffs' interests that it was inexcusable. We held that the exculpatory clause quoted above, interpreted in the light of the reasonable intention of the parties, and of public policy, did not necessarily apply to the facts recited in the petition.

The Government's motion having been denied, the case went to trial before a commissioner of this court. The plaintiffs did not prove what we understood them to have alleged in their petition.

Paragraph 14 of the petition, quoted above, first alleges that "it would have been practicable to have delivered the cement in bulk by another railroad to West Plains, Missouri and to have hauled the cement by truck 68 miles to the dam site." Our commissioner, in his finding 52, speaking of the West Plains alternative, said, "The haul from that point, however, would have been practical, if at all, only in bags." And in his finding 55 he said:

"* * * trucks suitable for hauling cement in bags were not sought by either party, nor inquries made about them at the time in issue, nor was this possibility seriously discussed, if at all, between the parties."

The quoted portion of finding 52 is not excepted to by the plaintiffs. No part of the quoted portion of finding 55 is excepted to, except the statement that the possibility was not seriously discussed. That exception is not well founded. It is worth noting that the commissioner found in his finding 55 that Brown & Root, the first-named plaintiff, itself owned or could have leased a fleet of 30 or 40 flatbed and pole trailer trucks of a type suitable for hauling cement in bags and that "there is no evidence that defendant knew this or that their availability was offered to defendant." No exception is taken to this finding. The commissioner's finding 67 ended with this sentence: "It is repeated that shipment by train to West Plains of bulk

cement for its transfer to trucks would not have been feasible." The plaintiff does not except to this finding.

Thus the first alternative method of delivery alleged to have been practicable would not have been feasible, and had never even been seriously thought of by any of the parties.

The second alleged alternative method of delivery was that the cement could have been hauled from the mill in Independence, Kansas, to the dam site "in bulk by truck" or "in bags by ordinary truck trailers." The discussion above shows that the plaintiffs never gave any consideration to the possibility of hauling the cement in bags from Independence, Kansas, to the dam site.

Paragraph 14 of the petition, quoted above, said:

"Plaintiffs endeavored to be of assistance to defendant and expressed a willingness to undertake delivery of the cement to the site upon modification of the contract."

The expression referred to was made on October 7, when the strike had been in effect nearly a month. Eleven days later the plaintiffs knew that the strike was about to be settled. No action upon this suggestion could have been taken in time to have expedited the delivery of cement. Further, the suggestion was made at the same meeting at which the plaintiffs introduced to the Government a trucker whom they, with the Government's assent, authorized to investigate the feasibility of trucking the cement. As we shall see hereinafter, the plaintiffs thereafter made no effort to learn the results of this man's investigation.

There remains for discussion the problem of hauling the cement in bulk, in trucks, from Independence, Kansas, to the dam site. If that was a practicable alternative method of delivery, the Government was under a duty to investigate it and make use of it, if prudence and due consideration of the interests of the plaintiffs required it, and if the Government's failure to do so caused dam-

age to the plaintiffs, it should compensate them.

The arrangement for delivery of cement in bulk by the mill in Independence into railroad cars, the transportation of the cars to a railroad spur in Cotter, Arkansas, their transportation over a railroad built by the Government from Cotter to the dam site, their handling and unloading at the dam site on facilities specially constructed by the plaintiffs for the purpose, was an ideal and efficient arrangement. Any abandonment of that arrangement in favor of a makeshift delivery by truck would have been a serious blow to efficiency and economy.

Not only the Government's agents, but the plaintiffs' agents, were fully aware of the possibility of a strike on the railroad. The plaintiffs knew that a strike which caught them at certain phases of their work would cause them great damage, damage amounting to thousands of dollars per day. The plaintiffs are among the largest contractors in the country, and in the area here in question. They knew at least as much about the availability of suitable trucks and the practicality of resorting to their use as the Government's agents knew. On July 6, 1949, when a strike had been called for July 11, the plaintiffs' superintendent, Mr. Slocum, met with the Government's representatives to discuss the implications of the impending strike. He made no mention of alternative methods of delivering cement. A similar meeting occurred on September 12, after the strike had actually begun. The question of what the plaintiffs should do with the 6500 barrels of cement which they had on hand was discussed and decided. Mr. Slocum made no mention of alternative methods of delivery.

On September 16 Mr. Slocum wrote the contracting officer, pointing out that the plaintiffs were incurring extra costs because of the delay in delivering cement and asking the contracting officer to issue a suspension order effective September 17, under GC–12. The suspension order was denied. As we shall see

hereinafter, the effect of a suspension order would have been to obligate the Government to compensate the plaintiffs for extra costs resulting from the suspension of the work.

In his September 16 letter, Mr. Slocum made no mention of alternative methods of delivering cement. On September 26 the contracting officer visited the dam site and he and Mr. Slocum discussed the effect of the strike. Mr. Slocum requested a suspension order but the contracting officer did not agree. Mr. Slocum made no mention of alternative methods of delivery of cement.

On October 4 Mr. Slocum wrote the contracting officer that unless cement were delivered promptly it would be necessary to suspend the work "for the convenience of the Government." In his letter he suggested that there were two alternative methods of delivering cement, one being shipment by rail to West Plains, thence by truck to the dam, the other being delivery by truck the 225 miles from Independence to the dam. As to the West Plains suggestion, it has been shown above that it was not practicable. As to the trucking all the way from Independence, it may be noted that Mr. Slocum had not even taken the trouble to ascertain the distance, which was not 225 miles, but 280 miles.

Mr. Ross White, an employee of Brown & Root, the largest of the plaintiff contractors, had made some inquiries as to the possibility of hauling cement by truck. He had seen on the highways the petroleum tank trucks of a Mr. York, of Houston, Texas. Upon inquiry of Mr. York he learned that he was an experienced trucker, had never hauled cement, and had a fleet of about 50 petroleum trucks and some dump trucks. At Mr. White's invitation, Mr. York met Mr. Ralphe, a representative of the contracting officer, on October 7. Mr. York said he would investigate the problem further by inspection of the dam site, the proposed truck routes and the loading facilities at the cement mill. He promised to report his findings to Mr. White and to

submit a price for the hauling. The plaintiffs furnished York with a car and a driver and he drove over the route from Independence to the dam, and talked to the people at the cement mill in Independence.

As to Mr. York's activities from this point on, one must consider which one of the plaintiffs' witnesses to believe. Mr. York testified that within a few days after the October 7 conference with Mr. White and Mr. Ralphe, he submitted to employees of Brown & Root a bid of $0.28 per hundred pounds for hauling the cement; that these employees said they would pass the bid along to Mr. White; that Mr. York several times thereafter contacted Brown & Root and was told that they were talking to the Government about the bid and were trying to get it approved.

The bid which Mr. York said that he made was never submitted to the Government. Mr. White testified that although he was at his usual place during the intervening time, he did not receive Mr. York's bid until October 29, which was several days after the strike was ended.

The plaintiffs in their comment on the commissioner's finding 30, say that Mr. White was right and Mr. York was wrong, in the serious discrepancy in the testimony referred to above. If Mr. York's testimony was wrong, it was deliberately false, since it described repeated contacts with the plaintiff Brown & Root and the responses to those contacts. Having thus discredited their witness, the plaintiffs are still obliged to rely on him almost exclusively for support of their contention that truck-hauling of cement in time to bridge the strike gap and prevent damage suffered by the plaintiffs was practicable.

With regard to Mr. White's inactivity, one must wonder why, having discovered Mr. York and commissioned him to investigate the feasibility of trucking cement and make a bid for the work, and having received no word from him, White made no effort to contact York and learn whether in his opinion trucking was fea-

sible and whether York would do it. The plaintiffs say on page 15 of their original brief that it was known on October 18 that settlement of the railroad strike was imminent. From that time, of course, no one would have had the slightest interest in trucking.

As to whether the conduct of the Government's representatives was, in view of the heavy losses threatened to the plaintiffs, so inconsiderate as to come within the rule stated in our decision on the motion, we now can decide in the light of the evidence. And the evidence shows that the Government's representatives' reactions to the threatened strike and the actual strike were essentially similar to the reactions of the plaintiffs themselves. The plaintiffs, faced first with the danger and then with the actuality of being heavily damaged by the strike, did not think it was feasible to make other arrangements for the delivery of cement. If they had so thought, it is impossible that they would not have said so. They were not amateurs, they were large professional operators, with all the skill and know-how necessary to meet the problems of large-scale contracting. On July 6, September 12, September 16, and September 26, there was discussion with the Government representatives about the problems raised by the strike, but no mention of truck deliveries of cement. On October 4, Mr. Slocum repeated his request for a suspension order, which he had requested in the earlier conference, and then suggested two alternative methods of delivery, neither of which he had really considered as shown by the fact that, as to one of them, the evidence showed that it was not feasible, and as to the other, Mr. Slocum did not even know the length of the suggested truck haul. Then came the York discussion on October 7, by which time the plaintiffs may have thought that, the strike having already lasted nearly a month, it might become unavoidable to devise an alternative method of delivery, but this was followed by Mr. White's complete failure to follow up the York negotiation, although that was the only

solution that the plaintiffs ever even proposed. It may well be that the explanation for Mr. White's abandonment of the York negotiation was an impression that the strike was soon to be settled. No other explanation appears in the record, or occurs to us.

The oft-repeated argument of the plaintiffs that the reason the plaintiffs did not urge the Government to arrange for trucking cement was that the Government had the responsibility for delivering the cement, and did not ask the plaintiffs for suggestions, will not do. The damage from non-delivery would fall upon the plaintiffs, the contracting officer had repeatedly refused to grant a suspension order, and the probability was that the extra costs would remain where they fell, i. e., on the plaintiffs. The plaintiffs did not achieve their position of high-level contractors by modestly refraining from volunteering a suggestion which would save them some thousands of dollars a day, because they had not been asked for suggestions.

As we see it, the Government's agents and the plaintiffs' agents were both hopeful that the strike, though long threatened, would never occur; they believed that if it did occur, its impact upon so many important interests would generate pressure which would cause it to be settled soon; that the setting-up of a system of delivery of cement by trucks for a short period was impracticable, since there was no trucker in the area who did such work and equipment would not be bought or converted for short-run or indefinite employment; that if a trucker could be found who was willing to undertake it, serious problems of licensing, permission to use roads, and other problems, would arise; that to contract with a trucker for the entire remaining deliveries of more than a million barrels of cement, in order to induce him to acquire the necessary equipment would, in the probable event of an early termination of the strike, leave the parties to suffer during the entire remainder of the contract from a ramshackle arrangement in place

of the efficient and economical arrangement under which they were working. Faced with this problem it may well be that both the Government's agents and the plaintiffs' agents dreaded even to think seriously about it. If in fact the plaintiffs' agent White began to think seriously about it in October, after the strike had continued for a month, and within eleven days of the time when it was known that the strike was about to be settled, no action could have been taken upon this initiative in time to have relieved the plaintiffs of their excess costs.

■ We do not find, on the part of the Government's representatives, any negligence, wilful or even ordinary, which was a cause of the damages suffered by the plaintiff. Even in the absence of the exculpatory clause relied upon by the Government, it would not be liable for those damages. United States v. Howard P. Foley Co., 329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 44. *A fortiori*, it is not liable when the contract contains the exculpatory clause.

■ The plaintiffs assert, as an alternative ground of recovery, that they were entitled, under GC–12 of the specifications of their contract, to an order by the contracting officer that the work be suspended during the period when they needed and did not receive cement, and an "equitable adjustment" of the contract price to compensate them for the damage caused by the suspension. The initial sentence of paragraph GC–12 says:

"The contracting officer may order the contractor to suspend all or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government."

The rest of the paragraph, including the provision for an equitable adjustment of the contract price, relates to such a suspension.

The plaintiffs' work was not suspended for the convenience of the Government. It was brought to a virtual standstill by

the strike on the Missouri Pacific Railroad. The Government did not cause, desire, or benefit from the interruption of the plaintiffs' work. Under the doctrine of the Foley case, supra, re-enforced, if necessary, by the exculpatory clause in the instant contract, the loss caused by the strike remains, unless shifted by the suspension of work provision, on the plaintiffs, where it fell. It would not serve the convenience of the Government to voluntarily pick up this loss and bear it. In the case of Flippin Materials Company, the Corps of Engineers Claims and Appeals Board, in its Decision No. 203, considered a situation similar to the instant one, and held that a suspension order should have been issued and an equitable adjustment made. In the Flippin case, however, the Board distinguished the case now before us on the ground that the contract involved in that case did not contain the exculpatory clause absolving the Government from liability for delays in deliveries. With deference, we think the interruption of work in this case was not for the convenience of the Government, and that paragraph GC–12 is inapplicable.

The plaintiffs' petition will be dismissed.

It is so ordered.

REED, Justice (Ret.), sitting by designation, and DURFEE, Judge, concur.

LARAMORE, Judge (dissenting).

I respectfully dissent for the following reasons: There is no question that plaintiffs were delayed in the performance of the contract by reason of the strike called by the employees of the Missouri-Pacific Railroad. I believe that had the defendant acted diligently in attempting to avoid the problems certain to be posed by a strike which had been under discussion for several months, was authorized on July 6, 1949 to become effective on July 11, but actually occurred September 9, 1949, some method could have been worked out whereby delays in delivery of cement could have been avoided. The failure on the part of the defendant to act, I believe, establishes a wilful neglect by defendant and a disregard of plaintiffs' interests and of defendant's implied obligations not to hinder performance of the contract, as well as to carry out its direct affirmative obligation to supply the cement, which it had voluntarily contracted to do. Williston on Contracts (1937), 1318, 1293A; Chalender v. United States, 119 F.Supp. 186, 127 Ct.Cl. 557; Thompson v. United States, 124 F.Supp. 645, 130 Ct.Cl. 1; American Bridge Co. v. United States, 72 Ct.Cl. 344; Rogers et al. v. United States, 99 Ct.Cl. 393; George J. Grant Construction Co. v. United States, 109 F.Supp. 245, 124 Ct.Cl. 202; J. A. Ross & Co. v. United States, 115 F.Supp. 187, 126 Ct.Cl. 323.

As the court stated in its prior opinion on defendant's motion to dismiss, Ozark Dam Constructors v. United States, 127 F.Supp. 187, 191, 130 Ct.Cl. 354, 360:

"* * * the non-liability provision in the contract, when fairly interpreted in the light of public policy, and of the rational intention of the parties, did not provide for immunity from liability in circumstances such as are recited in the plaintiffs' petition. * * *"

I believe the allegations of plaintiffs' petition have been proved by a preponderance of the evidence and they establish gross and wilful neglect by defendant and a disregard of defendant's implied obligations not to hinder performance of the contract and its direct obligation to make all reasonable effort to perform its contractual duties. Consequently, I believe the failure to grant plaintiffs' requests for an equitable adjustment of the contract price for the unreasonable suspension of work which occurred as a fact, at least in part, by reason of defendant's fault, was an arbitrary and capricious abuse of discretion.

The majority opinion seems to be premised on what the plaintiffs did not do, rather than the omissions of defendant. I believe the duty to act was on the

defendant rather than the plaintiffs. Of course, it was the duty of plaintiffs to mitigate their damages. They did apparently make some effort along this line by suggesting a change order to permit them to haul the cement.

Perhaps plaintiffs were not quite persistent enough in pressing for the use of a different means of delivery but, after all, the primary obligation rested upon the defendant. It seems fair also that a reasonable time should have been allowed for defendant to arrange for or permit other means of transportation to be used so that it perhaps should not be required to shoulder the entire loss. On the other hand, the plaintiffs should not be required to sustain the total loss for the entire period of the delay especially since defendant had contracted to deliver the item.

It is also indicated that if defendant had issued a change order permitting plaintiffs to arrange the transportation, the charges would have been greater than defendant had contracted to pay for rail transportation. This difference might well be subtracted from the amount of recovery.

Inasmuch as I believe an equitable adjustment should have been made, and since an equitable adjustment is a give and take proposition, I feel that as a result of the necessary negotiations involved, a figure approximating one-half of plaintiffs' actual damages would have been equitable under the circumstances. Surely defendant's representatives should not be permitted to sit on their hands and look contentedly into the teeth of a contractual obligation and make no effort to mitigate or reduce the damages. Certainly a nonliability clause in a contract should not serve to completely immunize the defendant where, as here, its own wilful or thoughtless failure has contributed to the loss.

I would permit recovery by plaintiffs in the sum of $176,962.16.

JONES, Chief Judge, joins in the foregoing dissenting opinion.