(No. 46931.—

CONTRACTING AND MATERIAL COMPANY, Appellee, v. THE CITY OF CHICAGO, Appellant.

*Opinion filed May 28, 1976.—Rehearing denied June 28, 1976.*

22

KLUCZYNSKI, J., dissenting.

Richard L. Curry and William R. Quinlan, Corporation Counsel, both of Chicago (Daniel Pascale and Richard F. Friedman, Assistants Corporation Counsel, of counsel), for appellant.

Robert G. Lussier, of Lussier and Dee, of Chicago, for appellee.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

Plaintiff, Contracting and Material Company, filed an action in the circuit court of Cook County against defendant, the City of Chicago, for monies allegedly owed by defendant pursuant to a written road construction contract awarded to plaintiff in July, 1965. Count I of plaintiff's complaint sought recovery for overtime and related expenses in the amount of $185,830.64 allegedly incurred as a consequence of accelerated work when defendant refused to grant plaintiff's requests for extensions of time to complete the project within the time limit specified by the contract. Count II, which sought other relief, was dismissed when that claim was settled during trial. After a bench trial, judgment was entered for defendant on count I, but on appeal, the appellate court reversed and remanded with directions to enter judgment in favor of plaintiff and to grant plaintiff a new trial limited to the issue of costs of acceleration. (20 Ill. App. 3d 684.) We granted defendant's petition for leave to appeal.

The principal controversy in this case involves the interpretation of various provisions of the construction contract pertaining to the circumstances under which the contractor is entitled to extensions of time to complete the job. The underlying facts bearing on this issue are not in dispute. In May, 1965, the City of Chicago advertised for bids for the construction of the South Lakeshore Drive - Southwest Interchange at 23rd Street in Chicago, generally known as the McCormick Place Interchange. The contract was awarded to plaintiff, who had submitted the low bid of $7,115,220.56. Plaintiff commenced work on the project on July 15, 1965. Although the pertinent contract provisions will be set forth in detail later in this

opinion, it suffices to note here that plaintiff was required by the contract to work two 8-hour shifts per day, 5 days per week, and to complete the project within 450 calendar days, which in this case was October 8, 1966. Except for 4 days at most, plaintiff worked single shifts only throughout the entire construction period and therefore was not in compliance with the double-shift requirement. Work proceeded without interruption until December 3, 1965, when defendant issued an order suspending all work on Ramp N-W until further notice as a consequence of objections raised by residents of the area concerning the design of the interchange. On January 3, 1966, defendant rescinded the suspension order, and construction of the ramp resumed after a delay of 46 days. In April, 1966, work was terminated again for a period of 58 days due to a labor strike. It is conceded that plaintiff was in no manner responsible for either of the two work stoppages which totaled 104 days.

Plaintiff made four written requests to defendant for extensions of time to complete the project due to the suspension order and the labor strike. By letter dated June 21, 1966, defendant advised plaintiff that it could not agree to the requests, since the contract provided that extensions would not be granted if the contractor failed to comply with the double-shift requirements. In a subsequent letter to the plaintiff dated August 22, 1966, defendant repeated its decision in this respect and stated: "It is essential, therefore, that you exert whatever efforts are required to meet the established completion date of October 8, 1966." Plaintiff thereafter began to work overtime to meet that deadline. Although the project was not completed until July 24, 1967, defendant did not seek to invoke the contract sanctions against plaintiff for failure to meet the specified completion date.

Plaintiff then commenced this action to recover the amount it claimed was owed by defendant for overtime and related expenses which it expended in its accelerated

work effort between August and November, 1966, in an attempt to complete the project within the prescribed 450-day period. Plaintiff's theory was that these expenses would not have been incurred but for defendant's refusal to allow the time extensions to which it was entitled under the contract.

The pertinent contract documents consist of four volumes. The first is entitled "State of Illinois, Department of Public Works and Buildings, Division of Highways, Standard Specifications for Road and Bridge Construction." This document was adopted in 1958 and was supplemented by an additional volume of "Supplemental Specifications" in March, 1964. For ease of reference these two volumes will be referred to as the Illinois Standard Specifications. The other two volumes were compiled by defendant and contain detail specifications and special provisions applicable to the project in question. These documents will be referred to as the City of Chicago provisions.

The provisions relied upon by plaintiff are articles 8.8 and 8.5A of the Illinois Standard Specifications, which read in pertinent part as follows:

"8.8 Suspension of Work. The Engineer shall have authority to suspend the work wholly or in part, for such period of time as he may deem necessary, due to conditions unfavorable for the satisfactory prosecution of the work, or to conditions which in his opinion warrant such action; or for such time as is necessary by reason of failure on the part of the Contractor to carry out orders given, or to perform any or all provisions of the contract. No additional compensation will be paid the Contractor because of any costs caused by such suspension, except when the suspension is ordered for reasons not resulting from any act or omission on the part of the Contractor, and not related to weather conditions. ***"

"8.5A Completion Date. When a completion date is stipulated, the Contractor shall, unless otherwise stated, complete all work included in the contract prior to that date ***.

> The Contractor shall complete all work on or before the stipulated completion date, or on or before a later date determined as specified herein; otherwise, the Department shall proceed to collect liquidated damages described hereinafter.
>
> When a delay occurs due to unforeseen causes beyond the control and without the fault or negligence of the Contractor, including, but not restricted to, acts of God, acts of the public enemy, governmental acts, fires, floods, epidemics, strikes (except those caused by improper acts or omissions of the Contractor), extraordinary delays in delivery of materials caused by strikes, lockouts, wrecks, freight embargoes, governmental acts, or acts of God, the time of completion shall be extended in whatever amount is determined by the Department to be equitable. ***"

The terms "Department" and "Engineer" are generally defined in articles 1.9(c) and 1.11(c) of the Illinois Standard Specifications to include a municipal authority and its engineer when a municipality awards the contract as in the present case.

Defendant places principal reliance on sections 2 and 120 of the City of Chicago provisions, which provide in pertinent part:

> "Time and Progress.
>
> Sec. 2. It is understood and agreed that TIME IS OF THE ESSENCE OF THIS CONTRACT, and the Contractor agrees to begin actual work covered by this contract in conformity with the provisions set forth in Requirements for Bidding and Instructions to Bidders and to prosecute the same with all due diligence, work two 8-hour shifts per day, 5 days per week, so as to complete the entire work under this contract *** within 450 calendar days after the date for commencement of work as specified in the written notification to the Contractor ***. *It is further understood and agreed that the aforesaid requirement relating to working two 8-hour shifts per day, 5 days per week, is essential to this contract and no extension of the times fixed for the completion of the work (any postponed part of the field painting of structural steel excepted) as provided under Section 120 of Special Provisions II (City of Chicago) shall be granted*

*if, in the opinion of the Commissioner and Purchasing Agent, the Contractor has failed to comply with said requirement to work two 8-hour shifts per day, 5 days per week.*

\* \* \*

Except as otherwise provided for under the provisions of Section 120 of Special Provisions II (City of Chicago) relating to unavoidable delay due to suspension of work, the time for completion of the entire work under this contract, excepting the aforesaid field painting of structural steel, shall be as established hereinabove in this Section 2, irrespective of the weather conditions prevailing during the period of time so established for the performance of the work under this contract. \*\*\*"

"Provisions Relative to Delay.

Sec. 120. Anything contained in the Contract Documents to the contrary notwithstanding, it is agreed that the following provisions relative to unavoidable delay shall be controlling.

Should the Contractor be obstructed or delayed in the commencement, prosecution or completion of the work under this contract by any act or delay of the City or by order of the Commissioner, then the time herein fixed for the completion of said work will be extended for a period equivalent to the time lost by reason of such acts or delays of the City or orders of the Commissioner and no time extensions will be granted for any other cause. \*\*\*

\* \* \*

It is further expressly understood and agreed that the Contractor shall not be entitled to any damages or compensation from the City, or be reimbursed for any losses, on account of any delay or delays resulting from any of the causes aforesaid.

No extension of time will be granted to the Contractor, however, unless he first notifies the Commissioner and Purchasing Agent in writing of the causes of his anticipated delay within ten (10) calendar days from the beginning of such delay, stating the approximate number of days he expects to be delayed. The Contractor must also make a request in writing to the Commissioner and Purchasing Agent for an extension of time within ten (10) calendar days after the cessation of the delay. The

Commissioner will analyze such request for extension of time and make a recommendation to the Purchasing Agent in writing, as to the number of days extension of time his records indicate are warranted. Compliance by the Contractor with the requirements set forth above in this paragraph are conditions precedent to the granting of an extension of time and it is hereby agreed that in case of failure to comply with the aforesaid requirements, the Contractor shall not be entitled to an extension of time on which the aforesaid requirements have not been fulfilled."

The appellate court concluded that the contract should be construed so as to give effect to each of the foregoing provisions. The court reasoned that section 120 of the City of Chicago provisions deals with city-caused delays and does not purport to cover either strikes or direct suspension orders which are governed by articles 8.8 and 8.5A of the Illinois Standard Specifications. In the court's view, those articles remain a viable part of the contract and are not superseded or negated by section 120. The court observed that to hold otherwise "would give defendant potentially unlimited power to suspend work without a reciprocal obligation to grant appropriate extensions. Such a power could easily lead to absurd and unconscionable results. Under such an interpretation the City could reduce performance time at will by virtue of its own suspension order. It seems unreasonable that any contractor would begin performance of a contract job with the knowledge that the performance period could be substantially reduced because of fortuitous or unavoidable circumstances." (20 Ill. App. 3d 684, 689-90.) The appellate court thus concluded that since plaintiff's right to extensions of time did not arise from section 120, the double-shift requirement found in section 2 was of no effect in this instance. The court also noted that even if plaintiff was bound by section 120, the double-shift requirement should not be enforced here due to the hazardous nature of the work and the lack of an adequate work force.

In urging reversal of the appellate court's decision, the defendant argues that there is a direct conflict between the provisions of section 120 and those of articles 8.8 and 8.5A for which reason section 120 takes precedence by its express terms; that section 120 contemplates that the contractor would be granted extensions of time when work "is obstructed or delayed by any act or delay of the City or by order of the Commissioner" but that "no time extensions will be granted for any other cause"; that section 120 therefore does not permit an extension of time on account of strikes which are not mentioned in that section; and that while the suspension order could be grounds for an extension of time under section 120, plaintiff was not entitled to the benefits of that section in this case, since it failed to fulfill the double-shift requirement which is an unqualified condition precedent to obtaining such extensions as is expressly provided in section 2 of the City of Chicago provisions.

In response, plaintiff argues that section 120 should not be construed to negate the fundamental contract rights afforded a contractor in cases of direct suspensions and strikes provided for in articles 8.8 and 8.5A; that section 120 does not purport to deal with either of those subjects but is instead designed to exculpate the City from losses suffered by a contractor where he is delayed by certain conduct of the City while granting the contractor a corresponding time extension for the delay; that the language of section 120 itself indicates it was not intended to apply to direct suspension orders, since it would be incongruous to require the contractor in such cases to notify "the Commissioner and Purchasing Agent in writing of the causes of his anticipated delay within ten (10) calendar days from the beginning of such delay" when the City obviously has notice of the suspension order it has issued; that the double-shift requirement found in section 2 of the City of Chicago provisions is not a condition precedent to all time extensions but only to those covered

by section 120 which is not applicable here; and that the contract is ambiguous and must be construed most strongly against the City.

In our opinion, the interpretation of the contract urged by plaintiff and adopted by the appellate court fails to give effect to the plain terms and intent of sections 2 and 120 of the City of Chicago provisions. It is apparent that the construction contract in this case is structured in such a manner that the City of Chicago provisions, drawn to apply specifically to the McCormick Place Interchange project, are to take precedence over the Illinois Standard Specifications to the extent there is any inconsistency or contradiction between the two. Language to this effect is found in several places in the contract, including section 101 of the City of Chicago provisions which, after describing the contract documents, provides in pertinent part that "[t]he Advertisement for Bids, Requirements for Bidding and Instructions to Bidders, Proposal and Acceptance, Special Provisions (City of Chicago) including Detail Specifications, Plans and Contract Bond *** constitute additions and revisions issued by the Bureau of Engineering of the Department of Public Works of the City of Chicago supplementing the 'Standard Specifications,' 'Supplemental Specifications' and 'Special Provisions (State of Illinois)' issued by the State of Illinois, and shall take precedence over said 'Standard Specifications,' 'Supplemental Specifications' and 'Special Provisions (State of Illinois)' wherever they conflict therewith." Sections 2 and 120 must be construed in this context.

Plaintiff correctly observes that some sections of the City of Chicago provisions make express reference to altering or superseding specified articles of the Illinois Standard Specifications while there is no comparable provision in section 120 expressly deleting articles 8.8 and 8.5A. This is understandable, since section 120 does not deal with all of the matters covered by those articles and does not purport to supersede those articles in their

entirety, but only to the extent of an inconsistency or conflict. In view of the clearly expressed intent of section 120 in this respect, we do not find it particularly significant that section 120 does not make specific reference to articles 8.8 and 8.5A.

Section 120 states in clear, certain and unambiguous terms that "anything contained in the Contract Documents to the contrary notwithstanding, it is agreed that the following provisions relative to unavoidable delay shall be controlling. ***" The "unavoidable" delays which it refers to clearly are those which are unavoidable by the contractor. (*Herlihy Mid-Continent Co. v. Sanitary District* (1945), 390 Ill. 160.) The section then goes on to specify the instances of delay for which an extension may be granted; namely, any obstruction or delay encountered by the contractor in the commencement, prosecution or completion of the work under the contract caused by "any act or delay of the City or by order of the Commissioner." It further expressly provides that "no time extensions will be granted for any other cause." We are unable to agree with the restrictive interpretation placed on these provisions by the appellate court. In plain language section 120 states that extensions of time may be granted for specified delays and none other and that the provisions of that section shall be the controlling ones irrespective of anything to the contrary appearing elsewhere in the contract. Section 120 thus supersedes all other provisions of the contract to the extent they purport to grant time extensions for delays other than those specified in section 120. In this respect it is evident that there is an irreconcilable conflict between article 8.5A and section 120 insofar as the former provision authorizes a time extension for strike delays whereas section 120 does not include a strike as one of the specified causes of delay for which an extension of time may be granted. Since section 120 is the controlling provision and permits no extensions on account of strikes, we conclude that the defendant was

not obligated to grant plaintiff the requested extension of time on account of the 58-day delay caused by the labor strike in April and May, 1966.

Whether plaintiff was entitled to an extension of time as a consequence of the suspension order issued by the City in December, 1965, presents a somewhat different question. It will be recalled that the appellate court determined direct suspension orders issued by the City were not within the purview of section 120. We are unable to concur with this conclusion, since it appears to us that an order issued by the City suspending work would clearly fall within the category of a delay caused "by order of the Commissioner" and could also be deemed a delay resulting from "any act or delay of the City" as those terms are used in section 120. Nor do we agree with the argument that the provision in that section requiring that the contractor give written notice of the causes and anticipated duration of the delay to the commissioner and purchasing agent indicates that the provisions of that entire section were not intended to apply to direct suspension orders issued by the City. One apparent purpose of the notice provision is to put the City on notice that the contractor is claiming a particular delay is being caused by the City. We agree that such notice is not particularly pertinent where a suspension order of the type issued in this case is involved. However, it is conceivable that such a notice would be pertinent where other types of direct suspension orders are involved; for example when the City directs a contractor to stop and resume work upon the happening of certain events or contingencies. In any event, it is apparent that section 120 is a very broad and comprehensive provision intended to cover city-caused delays of every kind. (*Cf. Herlihy Mid-Continent Co. v. Sanitary District* (1945), 390 Ill. 160.) The fact that the notice provision appears more relevant to certain types of city-caused delays than others does not in our opinion indicate that the entire section was to have the limited

application urged by plaintiff.

Although a direct suspension order is within the purview of section 120, the question still remains as to whether plaintiff in this case was entitled to the requested extension as a consequence of his failure to comply with the conditions of section 2 of the City of Chicago provisions. That section establishes the 450-day time frame for completion of the work and contains the express requirement that the contractor work two 8-hour shifts per day, 5 days per week. It specifically provides that the double-shift requirement "is essential to this contract and no extension of the times fixed for the completion of the work *** as provided under Section 120 of Special Provisions II (City of Chicago) shall be granted" if the contractor has failed to comply with that particular requirement. We do not agree with plaintiff's contention that sections 2 and 120 are self-contradictory, thereby rendering section 2 inapplicable by virtue of the "anything to the contrary notwithstanding" language in section 120. Section 2 simply establishes a condition precedent to the granting of extensions under section 120. The two provisions complement, rather than contradict, each other. Since plaintiff in this case did not fulfill the double-shift requirement as provided in section 2, we conclude that defendant was under no duty to grant the requested extension on account of the December 3, 1965, suspension order which delayed work for a period of 46 days.

On the basis of our review of the record, we have determined that the evidence does not establish either that the double-shift requirement was impossible of performance or that plaintiff made any serious effort to comply with that requirement. Although plaintiff presented testimony that the work could not be done properly or safely in double shifts and that there was a manpower shortage, the effect of this evidence is weakened considerably by testimony of plaintiff's vice president to the effect that plaintiff had never considered it necessary to work double

shifts to complete the job within 450 days and that the job had been estimated by plaintiff on the basis of single 8-hour shifts. This suggests rather strongly that plaintiff chose to ignore the double-shift requirement notwithstanding the fact that it is emphasized prominently in the contract documents as an "essential" condition precedent to the allowance of time extensions.

We also deem it appropriate to comment on several other matters pertinent to the conclusions we have reached. It has been suggested that it would be unreasonable that any contractor would begin performance of a contract job knowing that the performance period could be reduced because of fortuitous or unavoidable circumstances and that absurd and unconscionable results would follow if the contract was construed in such a manner to give the City the unlimited right to suspend work without a reciprocal obligation on its part to grant appropriate extensions. While we find nothing inherently unreasonable in a contract provision which places the risk of labor strikes on the contractor (see *Ozark Dam Constructors v. United States,* 288 F.2d 913 (U.S. Ct. Cl. 1961); *Fritz-Rumer-Cooke Co. v. United States* (6th Cir. 1960), 279 F.2d 200), we would agree that it would be unreasonable to construe the contract as giving the City the right to suspend operations at will without affording the contractor the opportunity for an extension of time to complete the work. That, however, is not our case. Here, the contractor is protected in the case of city-caused delays if he has fulfilled his obligation of working two 8-hour shifts per day, 5 days per week, as the contract provides. Viewed in this context, we find nothing absurd, unreasonable or unconscionable in these provisions as we interpret them.

The fact remains that the contract sets forth what the parties bargained for in a major construction project awarded to plaintiff after public bidding. To the extent that additional compensation is awarded, in the absence of unequivocal contract clauses so providing, the salutary

purposes of public, competitive bidding are diluted. The provisions relating to extensions of time and the double-shift work schedule to be adhered to by the contractor are integral parts of the bargain. It is not a proper function of the courts to alter the agreement of the parties by interpreting a contract to reach what might seem to be a more appropriate or equitable result under the circumstances as they have developed. As we noted in *Underground Construction Co. v. Sanitary District* (1937), 367 Ill. 360, 371, in considering an analogous situation: "This is the contract of the parties, and, however strongly we might feel that plaintiff has been more severely damaged, this court can declare the rights of the parties only by the contract, as the language of that instrument dictates." See also *Unicon Management Corp. v. City of Chicago* (7th Cir. 1968), 404 F.2d 627.

We hold, therefore, that the trial court correctly determined that defendant did not breach the contract by refusing to grant plaintiff the requested time extensions and consequently did not accelerate the work as claimed by plaintiff. Accordingly, the judgment of the appellate court is reversed, and the order of the trial court dismissing count I of plaintiff's complaint is affirmed.

> *Appellate court reversed;*
> *circuit court affirmed.*

MR. JUSTICE KLUCZYNSKI, dissenting:

I must disagree with the majority's interpretation of the contract provisions involved in this appeal, which holds that section 120 of the City's provisions conflicts with and is to take precedence over other contractual clauses.

The majority interprets section 2 . of the City of Chicago provisions to require the contractor to work "two 8-hour shifts per day, 5 days per week." The majority then applies this provision to the entire period of the construction project to plaintiff's prejudice and notes that, with the exception of 4 days, plaintiff never complied with

section 2. The thrust of the majority position would seem to recognize this situation as the basis of denying recovery to plaintiff. While defendant has strongly urged adoption of the trial court's position, even defendant has never asserted denial of relief to plaintiff on the basis that the latter did not comply with the double-shift specification of section 2 during all times of the project.

Moreover, an examination of defendant's work project reports contained in the record shows that plaintiff was deemed to be operating slightly behind the expected schedule throughout most of the project period. But that situation was never of such magnitude as to suggest that it was due to plaintiff's failure to work in double shifts. Rather, these project reports tend to indicate that at the outset of the project defendant did not anticipate that plaintiff would work double shifts.

The majority also characterizes sections 2 and 120 of the City of Chicago provisions as being "drawn to apply specifically" to this project. Such position is obviously premised on defendant's brief, which urges such interpretation and which further describes the Illinois Standard Specifications at issue herein as "boilerplate" provisions which are to be relegated to obscurity by the "tailor-made" provisions of the City of Chicago contract. It would appear that, insofar as section 120 is concerned, the defendant has incorporated a similar provision in other contracts. (See *Unicon Management Corp. v. City of Chicago* (7th Cir. 1968), 404 F.2d 627.) Such provision can hardly be described as having been placed in the contract specifically for this project.

The majority discerns no problem in the interpretation of the ambiguous contractual clauses herein because various other provisions of the City of Chicago contract specifically negated the effect of parallel sections of the Illinois Standard Specifications. The contract documents were lengthy and prepared by defendant, which does not contend that the terms were subject to negotiation. It

would seem that plaintiff was justified in taking said documents as presented. The City could have expressly negated the potential ambiguity between articles 8.8 and 8.5A and sections 2 and 120 by redrafting the latter to explicitly negate their effect as defendant did in regard to other articles. Plaintiff should not be prejudiced by defendant's failure to do so; and the contract should be construed most strongly against the one responsible for its preparation. (*Saddler v. National Bank of Bloomington*, 403 Ill. 218, 229.) "If, however, it is clear that the parties tried to make a valid contract, and the remaining doubt as to the proper interpretation is merely as to which of two possible and reasonable meanings should be adopted, the court will adopt that one which is less favorable in its legal effect to the party who chose the words." (3 Corbin on Contracts, sec. 559, at 262 (1960).) This case presents a proper situation for application of this rule. I would therefore adhere to the distinction applied by the appellate court in effectuating articles 8.5A and 8.8. However, to butress its position, the majority selectively applies the language of section 120 requiring notification of the duration of delay to the commissioner and purchasing agent to "certain events or contingencies" not otherwise delineated. The "plain terms" of section 120, as construed by the majority, however, require that "*No* extension of time" will be granted unless these notification procedures are fulfilled. The majority does not convincingly set forth a rationale for its distinction in this regard. And even if the majority is correct in its interpretation, it is obvious that such reasoning demonstrates the ambiguity arising from section 120.

The majority states that "it would be unreasonable to construe the contract as giving the City the right to suspend operations at will without affording the contractors the opportunity for an extension of time to complete the work." While the majority claims this is not the present case, it seems apparent the suspension ordered by the

defendant in regard to the neighborhood opposition to the construction design clearly falls within this description of forbidden activity by defendant. Moreover, the "clear, certain and unambiguous terms" of section 120, as interpreted by the majority, would hardly seem susceptible to such construction; and this interpretation would potentially conflict with the majority's later statement that "It is not a proper function of the courts to alter the agreement of the parties by interpreting a contract to reach what might seem to be a more appropriate or equitable result under the circumstances as they have developed." Moreover, this resolution would place every contract in doubt if the courts are to determine in each instance whether defendant acted properly in suspending operations, thereby tending to negate the salutary benefits of public bidding.

The majority accepts the uncompromising approach of defendant in regard to the labor strike. The majority dismisses the evidence of the impossibility of working double shifts because of a manpower shortage. As heretofore noted, the majority has discounted this evidence by noting that plaintiff could have worked double shifts throughout other periods of the project and thereby presumably completed the project within the specified time. My views pertaining to this position need not be reiterated at this point. I further find that a letter from defendant's Commissioner of Public Works to defendant's purchasing agent is supportive of plaintiff's position. There the commissioner recited the facts surrounding the construction strike at issue here, and he concluded that it halted all road construction in a 14-county area. This strike resulted in a loss of skilled workers to areas outside the sphere of the strike. The commissioner observed that, after the strike had terminated, contractors had great difficulty in rebuilding work crews. The commissioner recommended that the project completion dates be reset to take into consideration the actual strike delay with an

additional seven days as a minimal time needed to rebuild work crews. This letter certainly does not weaken plaintiff's position that working a double shift after the strike was virtually impossible.

Finally, the majority faults plaintiff because of the dilution of competitive bidding if relief is granted. It seems the majority is concerned with what have been called "cost overruns" caused, in part, by deliberate underbidding on public contracts. The damages here sought amount to no more than 3% of the total project cost. There is no indication of any bad faith on plaintiff's part.

The appellate court, which the majority reverses, construed the contract to give effect to each of the contract provisions pertinent to this case. That court reasoned that a credible distinction existed between the delay resulting from orders of defendant under section 120 of the City of Chicago provisions and orders by defendant directly suspending work as described in article 8.8 of the Illinois Standard Specifications. Under the circumstances of this case, the appellate court held that a direct governmental work suspension, as defined by article 8.5A, should be treated under article 8.8 and not section 120, thereby entitling plaintiff to performance extensions caused by defendant's suspension order. The appellate court expressed a similar view in holding that article 8.5A pertained to the labor strike in this case.

I find the reasoning of the appellate court regarding the interrelationship of the aforesaid contract provisions to be correct. For these reasons I dissent from the majority's result; and I would affirm the appellate court insofar as that court awarded partial judgment to plaintiff.